### GRUBBS v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. November 19, 1900.)

#### No. 1,390.

1. PUBLIC LANDS—CUTTING TIMBER FROM HOMESTEAD—INTENT.

Rev. St. § 2461, originally enacted in 1831, which makes it a criminal offense to cut or remove timber from any lands of the United States, has no application to the cutting of timber by a bona fide homesteader, and in a prosecution thereunder for the cutting of timber from a homestead by, or under authority from, the homesteader, the vital question is as to whether the homestead was taken and is being held in good faith, with intent to acquire title thereto by a compliance with the requirements of the homestead act.

2. SAME—PROSECUTION—INSTRUCTIONS.

There is no provision of law limiting or restricting the right of a homesteader to cut timber on his homestead, and while such cutting or the removal of timber must be for a legitimate purpose, having some connection with the cultivation or improvement of the land, a court cannot lay down specific rules governing his rights in that regard, and instruct a jury that, if a homesteader has failed to keep within the limits so fixed, the law conclusively presumes him guilty of a criminal trespass, for which he is subject to fine and imprisonment, but the question whether timber was cut for legitimate and proper purposes is one of fact, which depends on all the circumstances in each particular case, and in determining which the situation and financial condition of the homesteader are proper matters to be taken into consideration.

In Error to the District Court of the United States for the Eastern District of Arkansas.

The United States district attorney preferred an information against Jesse M. Grubbs, the plaintiff in error, for an alleged violation of section 2461 of the Revised Statutes of the United States, which, so far as it is applicable to this case, reads as follows: "If any person shall cut, or cause or procure to be cut, or aid, or assist, or be employed in cutting any live-oak or red-cedar trees, or other timber on, or shall remove, or cause or procure to be removed, or aid, or assist, or be employed in removing any live-oak or red-cedar trees or other timber, from any other lands of the United States, acquired, or hereafter to be acquired, with intent to export, dispose of, use, or employ the same in any manner whatsoever, other than for the use of the navy of the United States; every such person shall pay a fine not less than triple the value of the trees or timber so cut, destroyed or removed, and shall be imprisoned not exceeding twelve months." The information charged that the defendant cut the timber from land belonging to the United States. The defendant entered a plea of not guilty. There was a trial, and verdict and judgment against the defendant; whereupon he sued out this writ of error.

On the trial it appeared the defendant had purchased the timber he was charged with cutting from one Joel B. Hickman, who had entered the land from which the timber was cut as a homestead. Hickman, the homesteader, testified as follows: "The homestead consisted of 160 acres. Have known this property for 14 years. Have no other home than this homestead. About 14 years ago I attempted to homestead this property, but my wife would not agree to come back into the woods to live. Since her death I have drifted along from place to place with my little children, until I lost one, and one went to Texas. I wanted a home. I was tired of drifting. Had no home during six years. Took this place in good faith, to make a home for myself and children. I have been sick more or less for seven years, and have to support myself and family by hard labor, working on farms, chopping wood, or working in mills, or anything I could get to do. I took up this property in August of last year. Had two children with me at the time of going on the place. Was at that time working for defendant at his mill by the day, and I entered into an arrangement with the defendant shortly after I took up the property to cut the timber and put the lumber back so that I could make a building to go into and shelter my little children. I let the defendant have the timber at 50c. per thousand in the tree, and he was to return me lumber, nails, hinges, and other material for building the house and other buildings. There is probably five or six thousand feet of lumber in the house, part of it first and part of it second quality. He returned, as near as I know, as much or more material in value than I let him have. I have about one acre cleared and ready for the plow and fenced. There are three and one-half acres deadened. Rail timber sawed, and part of the rails laid, and the underbrush and tree tops burned. Have done all in my power to improve the land, considering the condition of my health, finances, etc., and could not have built this house at all except for the arrangement I made with Mr. Grubbs, unless I made the same arrangement with some other mill man. He was to take this timber at 50c. a thousand, and turn back lumber and furnish material, such as nails, hinges, etc., and I also made about 5,000 rails. Some of them are laid up. Expect to cultivate the land. Have a man employed to work on the place. He is to exchange with my little boy. He will cultivate the land for me for my boy to plow for him. I have no such thing as a plow, mule, or agricultural implement on the place, except a couple of hoes. Mr. Grubbs, the defendant, was to cut enough timber to put up my dwelling and barn, and the balance of the timber was to stand on the land. It was my intention to farm the place as soon as I was able. If I had not been bothered by fever, I would have had eight or ten acres in cultivation by this time. There are thirty acres on the homestead fit for cultivation. It is different patches. When I made the entry of these lands I got the money from Mr. Grubbs, the defendant, on my labor. There was nothing said about the timber on the homestead by Mr. Grubbs at the time I got the money to make the entry. He was allowed 50c. a thousand for the timber, and returned the lumber to

me at ranging prices. I told them not to cut the timber where it was rough, for it would be too expensive for me to handle the lands where the timber was cut. There was no talk between the defendant and myself at the time I made this arrangement with him as to whether or not I had a right to cut the timber. Afterwards we had a talk about it, and he said I had the right. I instructed them to cut the timber on the land which was smooth, so it could be used for agricultural purposes. They were simply removing the timber from these parts of the homestead so that later on it could be used for agricultural purposes. The logs had to be drawn one mile and a half or two miles to the mill, and the lumber had to be drawn back. The hands of Mr. Grubbs picked out the lands where to cut. and cut all the trees over twelve inches. He drew the logs away, and delivered the lumber. Some of the lumber was dressed,—the flooring and ceiling. I personally did a month or more work on the place,—such work as I was able to do. Whenever I could get enough ahead I would work on the land, cutting rail timber, making rails, cutting down trees, or in clearing the land. I continued working for Mr. Grubbs until I got sick. I worked one time seven days on the land, and at odd times parts of days. When arrested, in June, none of the land was cleared,—about one acre brushed, and the rails made." James N. Corbett, another witness, testified substantially to the same facts.

The court' charged the jury, in part, as follows: "But if a man of limited means goes upon a claim, and is able during the first years to cultivate only a few acres, he is only authorized to cut the timber off the few acres that he intends to cultivate and is able to cultivate. If he cuts down the timber off the 40 acres, it should be in pursuance of a definite plan that the plow should follow the ax, and that the entire forty acres shall be put to use for the purpose of cultivation, or in such manner as a farmer makes use of land; that is, tillable land. The balance of the timber on the homestead, if it is a claim covered by timber, should remain as a preserve,—a timber preserve,— for the future benefit of the land, and should be removed only and so fast as the settler finds it necessary to remove it in order to put in cultivation the land he intends to cultivate in good faith. The declaration and settlement must be in good faith, and supported by a compliance with the requirements of law by making a home upon the land, actually living upon it, and actually proceeding in good faith in the regular way, by regular process of improving the land and putting it in cultivation, and until he has perfected his right by full compliance with the law, and received his patent, he has no right to cut down and sell the timber on other portions of the land, which he is not intending to immediately put into cultivation. Now, in regard to the intention, I want to state to you that that cannot always be ascertained by what the parties say, but may be more correctly found by what the parties do. The question is not whether the parties believe that the cutting of the timber off the land homesteaded was right under the law, for all persons are presumed to know the law, and to intend the natural results of their acts; so if you find in this case from the evidence that the defendant, knowing the condition of these lands, that they were recently homesteaded, and that the timber that they obtained permission to cut was cut off lands not put in cultivation, and not to be put immediately into cultivation, then the law presumes that they intended to violate the law." Due exception was taken to the quoted parts of the court's charge. The defendant requested the court to give the following instructions: "If Corbett and Hickman having homesteaded these lands, in good faith cut and removed, or authorized the defendant to cut and remove, timber from such parts of the lands as they in good faith intended to improve, and exchanged such timber with defendant for lumber and other materials which have been in good faith placed on the homesteads, and that this lumber and other material was necessary to enable Corbett and Hickman to live upon and improve their homesteads, and that the timber was not sold to simply get the purchase price thereof, and denude the lands, then you will find the defendant not guilty. If you find Hickman and Corbett were poor men, without means to buy lumber and other materials for building upon and improving their homesteads, and that the timber removed was exchanged for lumber and other materials to build houses upon these lands, and that this lumber and other material was put into houses and improvements upon these lands, and

that Corbett and Hickman and their families have resided in these houses since they were erected, these would be very strong circumstances tending to prove the good faith of the transaction. The law does not contemplate that the homesteader must plow all the land he improves, but he may use it for pasturage or any other purpose to which it can be put to assist in making him a home and living for his family. The law does not contemplate that the poor homesteader shall let his family starve while he clears the land, 'that the plow may follow the ax,' but he may work out by the day to earn a living for himself and family, and improve the land as rapidly as he can in his circumstances. Neither does the law rob a homesteader of his homestead because he may be sick, and unable to improve the land as rapidly as his well neighbor. The law is reasonable, and only requires that he act in good faith; and if Corbett and Hickman acted in good faith in taking the homesteads and improving them, and exchanged such timber for lumber and other material as was necessary for the improvement of the homesteads, and that this exchange was necessary in order to build houses and make the homestead tenable, and did this in good faith, then the defendant is not guilty." To the refusal of the court to give these instructions due exception was taken.

E. H. Vance, H. F. Auten, and W. F. Hill, for plaintiff in error.
Jacob Trieber, for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

CALDWELL, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The acts of congress relating to the settlement upon and acquisition of the title to public lands by actual settlers, and the practice of the land department under them, are controlling in determining the rights of such settlers. Although this case arises under the homestead act, it will be profitable to advert briefly to an earlier statute, which gave to actual settlers the preference right to purchase the public land on which they had settled, upon conditions which, so far as relate to the occupancy (except the period of its duration) and improvement of the land, are in substance identical with the later act, known as the "Homestead Act." In 1841 congress passed what is commonly called the "Pre-emption Act." That was the first act which recognized the superior claims of actual settlers to the public lands. The act gave to the actual settler on the public land the preference right for one year to purchase at the minimum price the public land, not exceeding one quarter section, upon which he had settled. The grant was in these terms: "Every person being the head of a family  *  *  *  who has made or hereafter makes a settlement in person on the public lands subject to pre-emption, and who inhabits and improves the same and who has erected or shall erect a dwelling thereon is authorized to enter.  *  *  *"  Section 2259, Rev. St. U. S. The act gave the pre-emptor the right of occupancy, use, and enjoyment of the land, and everything growing thereon, for one year, during which time the settler had the exclusive right to enter the same at the minimum price of the public lands. The purpose to give this right to the settler was to enable him, by the use of the land and its products, to raise the money to enter the land. The act imposed no restrictions on the pre-emptor in relation to cutting timber on his pre-emption, or the use he should make of the timber he did cut, nor

did it prescribe the materials out of which the pre-emptor's "dwelling" should be constructed, or how or where or by what means such material should be procured. In actual practice, a log cabin, such as a settler with no other implement than an ax could erect, satisfied the requirements of the act. In the case of pre-emptors without means,—and there were many such,—the land was made to support his family, and to pay for itself by its products, whether crops, timber, stone, or coal. In actual practice in a good many cases a single year proved too short a period in which to raise the entrance money, but the early settlers supplemented the act of congress with laws enacted by themselves, known as "claim laws," which, while they did not have the sanction of any legally constituted legislative body, proved entirely effectual to protect the settler in the enjoyment of his pre-emption until he could, by utilizing every source of revenue the land afforded, raise the purchase money to enter it. The lands in the Western states were largely taken up by settlers whose want of resources and necessities compelled them to avail themselves of the beneficent provisions of the pre-emption act. It is matter of history, as well as a fact within the personal knowledge of many now living, that the settlers who availed themselves of the provisions of the pre-emption act made such use of the land and the timber growing thereon as their interests and necessities demanded; and it is not believed a single instance can be found where a bona fide pre-emptor was criminally prosecuted for cutting timber on his pre-emption, although instances were not rare where the pre-emptor procured the money to enter his pre-emption by selling saw logs and other timber cut therefrom. When the land was situated on or near navigable streams, saw logs were frequently floated hundreds of miles to market. The idea of prosecuting criminally a bona fide pre-emptor for cutting timber to procure the money to enter his pre-emption never entered the brain of any man, and would not have been entertained for an instant by any department of the government. Congress knew all these practices of the settlers, and never legislated against them, but by its silence acquiesced in them, and no department of the government ever presumed to regulate by rule the mode or manner in which the preemptor must proceed in clearing and improving his pre-emption.

In time it was found that the minimum price of $1.25 per acre, which the settler was required to pay under the pre-emption act, operated to prevent men of families, without means, from acquiring homes on the public lands. It was also perceived that the public lands were rapidly passing into the hands of speculators and capitalists, who held them at prices which precluded men of moderate means even from purchasing them for homes, and removed them entirely beyond the reach of men of families without means. It was to remedy these conditions that congress in 1862 passed the homestead act. This act adopted a much more liberal policy towards settlers on the public lands than the pre-emption act. The act declares: "Every person who is the head of a family * * * shall be entitled to enter one quarter section * * * of unappropriated public lands. * * *" Section 2289, Rev. St. U. S. "The

person applying for the benefit of the preceding section shall make affidavit * * * that such application is made for his exclusive use and benefit and that his entry is made for the purpose of actual settlement and cultivation and not either directly or indirectly for the use or benefit of any other person. * * *" Section 2290, Id. Section 2291 provides that no certificate or patent shall be issued for land entered under a homestead act until after the expiration of five years from the date of the entry, and the homesteader "proves by two credible witnesses that he * * * has resided upon or cultivated the same for the term of five years immediately succeeding the time of filing the affidavit, and makes affidavit that no part of such land has been alienated. * * *" Section 2297 provides that if at any time before the expiration of the five years it is proved that the person making the entry "has changed his residence or abandoned the land for more than six months at any time, then in that event the land so entered shall revert to the government." It will be noted that, like the pre-emption act, the homestead act imposes no restrictions on the homesteader in relation to cutting timber, or the use he shall make of the timber he does cut, nor does it prescribe the materials out of which the settler's dwelling and other improvements shall be constructed, or how or where or by what means such materials shall be procured. Nor does the act expressly or by implication prescribe how the bona fide homesteader shall open, clear, cultivate, or use the land and the timber growing thereon, or the character or extent of the improvements he shall make, or how rapidly and to what extent he shall put the land to cultivation, and particularly it does not require that he shall not clear land for any purpose except to plow it, and that the "plow must follow the ax." The leading object of the act was to afford men of families, having little or no estate, an opportunity to acquire a home on the public lands. But to the settler without means the acquisition and establishment of a home on the public lands is no holiday affair. He and his family are frequently subjected to great hardships and trials, and sometimes to actual want and suffering. With no resources or capital but the labor of his own hands, the homesteader is compelled to provide shelter and support for himself and family, and open and improve his homestead as fast and as best he can, under the conditions surrounding him. Such was the condition of the homesteader in this case. Opening a homestead under these conditions is a slow and laborious task, and the homesteader is necessarily restricted to the methods compatible with his resources. All these facts were within the knowledge of congress, and it is highly improbable that that body contemplated that the bona fide homesteader should be denied the use of the timber on his homestead to prevent starvation or procure medicine for his sick family, while honestly striving and intending to make a permanent home for himself and family on the land. Cognizant of the wants and necessities of the homesteaders who possessed limited or no estates, no such restriction was imposed by congress.

The fundamental and the only restrictions or conditions imposed on the bona fide homesteader by the act of congress are that he

shall enter the land for his own exclusive use, and with the honest purpose and intention of residing upon and cultivating it for five years. There is not a word in the act restricting or limiting his use of the land or the timber on it, and it was not the intention of congress that the bona fide homesteader should be limited or restricted in this regard. Such a homesteader who actually resides upon the land, and cultivates even so much as a garden patch, with the fixed intention of maintaining and continuing that residence for five years, for the purpose of acquiring the title to the land as a home for himself and family, satisfies the requirements of the act of congress, and no department of the government is authorized to impose others. The act of congress provides that the homesteader, upon making proof that he has "resided upon or cultivated" the land for the term of five years, shall receive a patent. And the rules and regulations of the land department adopted by the commissioner of the general land office, and approved by the secretary of the interior, provide that "in grazing districts stock raising and dairy productions are so nearly akin to agricultural pursuits as to justify the issue of patent upon proof of permanent settlement and the use of the land for such purposes." Circular from General Land Office, etc., issued July 11, 1899, p. 14. There are lands in the mountainous regions of the West whose altitude is such that crops cannot be grown on them at all, and yet they are valuable for grazing and stock raising. There are ranches of this character whose surfaces were never touched by a plowshare. Would the rule laid down by the lower court that "the plow must follow the ax" apply to such homesteads, and would the settlers be denied the use of the ax because the plow could not follow it? If it were permissible to prescribe rules for the guidance and control of every homesteader in opening and cultivating his land, it would be a grave error to suppose that all homesteads are alike, and that a rule could be framed equally applicable to all. It is no less an error to suppose that all homesteaders want to open their land at the same time, or in the same way, or put it to the same use, or that they are equal in resources and ability, and could, if they desired, conform to a uniform rule or method.

It is worthy of notice that the act upon which the information in this case is based was passed in 1831, and could, therefore, have had no reference to the cutting of timber by a homesteader on his homestead under the act of 1862. If a bona fide homestead entry is not taken out from under the operation of the act of 1831, it is not perceived why the homesteader may not be prosecuted for cutting the logs for building his cabin on his homestead. There is not a word in the act subjecting the bona fide homesteader in any case to the pains and penalties of the act of 1831; but this was done in the lower court in this case, who took it upon itself to say what a homesteader may and may not do, and what he must do in relation to the timber growing on his homestead, and to say when the act of 1831 shall and when it shall not be enforced against him for cutting timber on his homestead, without regard to his good intentions and honest purpose to comply with all the obligations imposed

on him by the law in reference thereto. This was ignoring the vital question in the case.

At the threshold of every case of this kind the crucial question is, was the declaration of the homesteader, made under oath at the time he entered the land, that his entry was made for his exclusive use and benefit, and for the purpose of actual settlement and cultivation, and not either directly or indirectly for the use or benefit of any other person, true and made in good faith? If it was, then the entry was a valid entry, and invested the settler with all the rights of a bona fide homesteader; and so long as he continues in good faith to observe this declaration, by residing upon and cultivating the land with the bona fide intention of perfecting his entry by the required five years' residence, he cannot be deprived of his homestead, convicted of a criminal trespass, and incarcerated in jail, because, in making his improvements and clearing his land and disposing of his surplus timber, he did not conform to some ideal method or rule conceived by those who probably never felled a tree or plowed a furrow. Such rules have the sanction of no law, and no citizen can be criminally punished for not observing them. On the other hand, if the entry was made in bad faith, and with no intention of residing upon and cultivating the land for five years, but with the formed design of using the entry as a mere screen, while he cut and removed the timber from the land or caused it to be done, or if the entry was made, in the language of the law, "either directly or indirectly for the use or benefit of another," in either case the entry would be fraudulent and void from its inception. It would in law be no entry, and the cutting of a single tree by such fraudulent homesteader for any purpose whatever would be a criminal trespass. And so, too, if, after making an entry in good faith, the homesteader reconsiders his good intention, and proceeds to denude the land of its timber, and put the avails in his pocket, intending, as soon as he has accomplished his fraudulent purpose, to abandon his entry, he is guilty of a criminal trespass. The guilt or innocence of the defendant in this class of cases turns upon these questions of fact. It is a question of good faith and honest intention.

It is argued, however, that there are cases in which it is difficult to prove the homestead entry was fraudulent, or made for a fraudulent purpose, and that to meet such cases the court should lay down rules so stringent, and exacting as to absolutely preclude all fraud. This argument calls for a few observations. If the existing law is defective,—which is not admitted at all,—its amendment rests with congress, and not with the courts. The courts cannot frame rules which will supply the want of statutory enactments in criminal cases. Again, in an effort to punish fraudulent and dishonest homesteaders, the court should not lay down rules which will effectually exclude honest and bona fide homesteaders, with little or no means, from successfully availing themselves of the benefit of the homestead act. Some of the rules suggested would deprive the very class of people for whose benefit the law was enacted from all benefit under it, and only a full-handed farmer possessed of teams, plows, and all kinds of farming implements, and ample

means to live on, until the homestead was brought into cultivation, and made productive, could safely venture to enter a homestead. Under these rules, "the man with the hoe" and an ax, which seem to have been the only farming implements the homesteader in this instance possessed, though he act in perfect good faith, and with an honest purpose and desire to acquire a homestead, in which he would have succeeded had he been let alone, will inevitably land in jail as a criminal trespasser. .The honest and bona fide homesteader should not be deprived of his homestead, and criminally punished, lest some guilty man should escape punishment.

But such rules are not necessary in order to convict the guilty. The bona fide settlers and owners of land, who largely compose the juries in federal courts, have no sympathy with timber thieves, and are quick to detect all their disguises. They know how to draw the line, and can, when the facts are laid before them, readily distinguish between an honest homesteader and a dishonest one. For a quarter of a century the writer of this opinion tried all this class of cases in the district from which this case comes, and he does not recall a single instance where a fraudulent homesteader, or his vendee with guilty knowledge, who had stripped the land of its timber, was not convicted.

.The doctrine we have announced is not new in this court. In the case of Conway v. U. S., 37 C. C. A. 200, 95 Fed. 615, Judge Adams, in delivering the unanimous judgment of the court, said:

"It is a well-settled construction of the homestead statute that while a settler acquires no title to the lands entered by him until the issue of the patent, at the expiration of five years after the entry, he has nevertheless a right during these five years to treat the lands as his own, in a certain qualified sense,—to the extent, at least, of performing those acts which are required under the law to entitle him to a patent therefor. He must reside and continue to reside upon the lands entered, and cultivate and continue to cultivate the same for a period of five years. To perform these conditions necessary to the acquisition of title, he clearly has the right to utilize the timber growing upon the land for the purpose of building himself a house to live in, and such outhouses and fences as may be reasonably necessary for his initial and progressive farming operations. He may also, and must, in the performance of the condition of cultivation, first prepare the land therefor. If there be growing trees or dead timber, which are impediments to successful husbandry, he may clearly remove the same, or cause them to be removed, so far as the legitimate purpose of cultivation reasonably warrants; and he may, subject to such limitations, sell the same, and appropriate the money realized therefrom. While a settler may avail himself of these necessary privileges, he must at all times act in good faith in the exercise of them. He cannot invoke or pretend to exercise them as a cover to despoil the lands of their timber, or to make profit out of them, without regard to the legitimate purpose of building him a home, outbuildings, and fences, and fitting the soil for cultivation and use. * * * These averments, in our opinion, are the equivalent of saying that the timber was caused to be cut by the settler in order to fit and prepare the land for cultivation. If these averments are true,—and we must so treat them for the purposes of this case,—and if the defendant was engaged in doing the work of clearing in good faith, for the purpose of preparing the land for cultivation, then, even though the settler was to receive in money the value of the timber so cut, the act would be justifiable under the law, and the person employed to do it would not be liable to the United States therefor. As has been frequently expressed in judicial utterances found in the cases above cited, the question is one of good faith on the part of the settler. The cutting, to be justifiable, must be fairly and reasonably an incident to real

cultivation and improvement, as distinguished from a denuding of the land of its timber merely for the purpose of selling the timber and securing the purchase price. The portion of the answer already considered was intended to state a complete defense or a bar to the cause of action; but there is another feature of the answer which sets forth, in our opinion, a partial defense. That is the portion of the answer averring that Conway was to employ and did employ the timber cut, either directly or indirectly, in erecting a dwelling house and necessary outbuildings for the settler. To the extent to which the logs cut went into the construction of such dwelling house and outbuildings, under the authorities already cited, or to the extent to which the money received for the logs was in good faith employed to construct a dwelling house and outbuildings, there could be no recovery in this case."

The law as laid down in the opinion from which we have quoted was not regarded by the lower court in charging the jury in this case. The jury were told that the timber could only be cut "in pursuance of a definite plan that the plow should follow the ax." This is said to be an extract from a judicial opinion. It is entirely admissible to embellish judicial opinions with metaphors, figures of speech, and flowers of rhetoric, but such scraps of judicial exuberance are not to be laid before a jury as cast-iron rules of law, by which they are to be bound in forming their verdict. They leave too much to the imagination, and are far too elastic, for instructions to a jury. But in this instance, that there should be no misunderstanding as to when the plow should follow the ax, the jury were told, in another instruction, that if the timber "was cut off lands not put in cultivation, and not to be immediately put in cultivation, then the law presumes they intended to violate the law." In these two instructions the jury were told, briefly and in substance, that the "plow must follow the ax * * * immediately," and, if it did not, "then the law presumes they intended to violate the law." No matter that the homesteader acted in good faith; no matter that the failure to follow the ax with the plow arose from the homesteader's limited resources and present inability to do so, or from other causes which would excuse or justify it; no matter that the land was being cleared for pasture or grazing land, and not to be plowed at all,—none of these facts were of any avail against the positive and absolute presumption of law that the defendants intended to violate it. It will be observed that the court did not tell the jury that the failure to follow the ax with the plow was a circumstance to be considered by them in determining with what intent the timber was cut, or that it was prima facie evidence of the defendant's guilty intention, but the jury were told, in round and unqualified terms, that from that fact alone the law presumed a guilty intention. It is needless to say that there is no such presumption of law. A sounder view of the law is expressed in the volume of instructions prepared by the commissioner of the general land office, and approved by the secretary of the interior, addressed to those charged with the duty of administering the land laws of the United States, and to instruct the citizens as well, where it is said: "But the question whether the land is being cleared of its timber *for legitimate purposes* is a question *of fact* which is liable to be raised any time." Circular from General Land Office, etc., 1899, p. 275. The italics are in the book. With what in-

tent the timber was cut was a question of fact for the jury to determine from a consideration of all the facts and circumstances in the case. There is no more a conclusive legal presumption of guilt arising from failing to plow land immediately after the timber is cut off than there is a conclusive legal presumption of innocence when the land is plowed. A fraudulent homesteader might the better to screen his fraudulent design, while stripping the land of its timber, plow it, but that would not condone his offense. The instructions asked by the defendant, which are set out in the statement, express the law applicable to the case as we have declared it, and it was error to refuse them; and the charge of the court, so far as it conflicted with the views we have expressed and the instructions asked by the defendant, and which should have been given, is erroneous. The judgment of the district court of the United States for the Eastern district of Arkansas is reversed, and the cause remanded, with instructions to grant a new trial.