### TELLER v. UNITED STATES.

#### (Circuit Court of Appeals, Eighth Circuit. December 30, 1901.)

#### No. 1,537.

1. PUBLIC LANDS—TIMBER—CUTTING—INTENT—MISDEMEANOR—CHARGE.

Under Rev. St. 1878, § 2461, 20 Stat. 89, and 27 Stat. 348, making it a misdemeanor for any person to cut timber on any lands of the United States situate in any of the public-land states with intent to export or dispose of the same, where the cutting is admitted, the only intent necessary to show is the intent to export or dispose of the timber.

2. SAME—EVIDENCE—PURCHASE OF OTHER LANDS.

On the trial of one accused of unlawfully cutting timber on land of the United States, evidence that about the time of the cutting defendant purchased and paid for the full quantity of similar land, which he could purchase under the act of June 3, 1878, is inadmissible to show that he would not intentionally commit a trespass.

113 F.—18

**3. SAME—VIOLATION OF LAW—CUSTOM.**

On the trial of one accused of unlawfully cutting timber on land of the United States, evidence of a custom in that locality, known to the general land office, of entering on land and cutting the timber therefrom before patent was obtained, is inadmissible, since a custom to violate the law cannot justify itself.

**4. SAME—HONEST INTENT.**

Where defendant unlawfully cut timber on public land, the fact that he acted in accordance with a general custom in that locality is not evidence of an honest intent on his part.

**5. SAME.**

Where defendant unlawfully cut timber on public land, the fact that before cutting he endeavored to ascertain whether the land was surveyed, and also notified a special agent of the government that he was cutting the timber, and was not warned off for three weeks, is not evidence of an honest intent.

**6. SAME—CHARGE.**

On the trial of defendant for unlawfully cutting timber on public land, the court charged that, in order to convict, the jury must find that there existed in his mind a willful and wrongful purpose to obtain the timber in violation of law; and that if he entered on public land knowing it was such, without having complied with the provisions of law giving him a right to do so, and cut timber therefrom, they would be authorized to find the requisite criminal intent. *Held,* that such charge fairly stated the law, and was as favorable to defendant as he was entitled to.

**7. SAME—EVIDENCE—INTENT.**

Where defendant admits that he had cut timber on 300 acres of unsurveyed government land, to which he had no claim or color of title, and there is evidence that he was informed by the register of the land office that he could not acquire title because the lands were not open to entry, and that he promised his workmen that he would stand between them and the government, and that he had fully exhausted all his privileges of purchasing such lands, the intent constituting the offense of unlawfully cutting timber on government land, defined by Rev. St. § 2461, and Act June 3, 1878, is sufficiently shown.

**8. SAME—APPLICATION TO PURCHASE—RIGHT TO CUT TIMBER BEFORE PATENT—LICENSE TO CUT.**

An occupant of a mineral claim, who has applied for a patent before the purchase price is paid and before he receives a certificate, has no right to cut the timber on such claim with intent to export or remove the same, and a license from him to so cut the timber gives no protection to the licensee as against the government.

**9. SAME—MINERAL CLAIM—SEPARATION FROM PUBLIC DOMAIN.**

The exclusive right to occupy and work a mineral claim, given to the locator by the mining laws during his occupancy, does not segregate such claim from the public domain, so as to exclude such land from the operation of Rev. St. § 2461, 20 Stat. 89, and 27 Stat. 348, making it a misdemeanor for any person to cut timber on the public lands.

In Error to the District Court of the United States for the District of Wyoming.

Willard Teller (Clayton C. Dorsey, on the brief), for plaintiff in error.

Timothy F. Burke, for the United States.

Before SANBORN and THAYER, Circuit Judges, and ADAMS, District Judge.

ADAMS, District Judge. On November 25, 1899, a criminal information was filed in the district court of the United States for the district of Wyoming against John C. Teller, the plaintiff in error, charging him with having, between January and September of the year 1898, willfully and unlawfully cut and procured to be cut 150,-000 feet of timber growing on the public lands of the United States in said district, with intent to export and dispose of the same. In due course a trial was had, the defendant found guilty, and sentenced to pay a fine of $1,000.

The statutes under which this information was lodged—Rev. St. 1878, § 2461; Act June 3, 1878 (20 Stat. 89); and Act Aug. 4, 1892 (27 Stat. 348)—make it a misdemeanor for any person to cut or procure to be cut timber growing on any lands of the United States situate in any of the "public-land States" with intent to export or dispose of the same. The defendant is accused of cutting timber from two certain tracts of public land in Carbon county, Wyo., one located on Cottonwood creek, and supposed to have been land subject to entry and sale under the act of June 3, 1878, commonly known as the "Stone and Timber Act," and the other being a certain mining claim known as the "Montezuma Placer." The record shows that an admission was made by the defendant at the trial "that he cut timber on 300 acres of unsurveyed government land to which he had no claim or color of title." This admission relates to the cutting on the first-mentioned tract, located on Cottonwood creek. The trial court charged the jury that, before they could convict the defendant, they must find that there existed in his mind "a willfull and wrongful purpose to obtain the timber in violation of the law"; and also that, "if the defendant entered upon the lands of the United States, knowing the same to be a part of the public domain of the United States, and without complying with the requirements of the statute, or attempting to do so, cut, or caused to be cut, timber growing thereon, you will be authorized to find that such cutting was willfull and intentional, and if you do so find the defendant would be guilty, and you should say so in your verdict." In other words, the trial court practically instructed the jury that the intentional cutting of timber found growing on lands known by the person cutting the same to be a part of the public domain constituted a misdemeanor denounced by law. The defendant takes issue with this declaration, and contends that the jury should have been told that there must have been an actual evil or criminal intent, or bad purpose, amounting to moral culpability, in order to convict, and that the court erred in excluding evidence tending to show that the defendant, although cutting timber from lands known by him to have been public lands, cut the same with an honest purpose. The particular facts offered to be proved and relied on by defendant to establish such honest purpose with respect to the cutting from the first-mentioned land are as follows: In June, 1898, the defendant entered 160 acres, and four other persons each entered 160 acres of the same character of lands lying in the near vicinity to those upon Cottonwood creek now in question, for which defendant paid to the United States the price required by the stone and timber

act, namely, $2.50 per acre, or a total of $2,400. Defendant's counsel contend that such purchase by him of similar lands and payment therefor at about the same time as is laid in the information is a circumstance which ought to have gone to the jury as evidence that he would not intentionally commit a trespass for the sake of obtaining timber of the same character a short distance away. We entirely fail to appreciate the force of this contention. The act of June 3, 1878, supra, provides in express terms that the timber lands therein contemplated may be sold to citizens "in quantities not exceeding 160 acres to any one person or association of persons." Defendant had already purchased his full limit of 160 acres, if, indeed, he had not indirectly secured the four other quarter sections above referred to; and, conceding that he had paid for that land, it cannot be that such fact would have any tendency to show that he had an honest purpose in trying to appropriate other lands. He had exhausted his right already, and he knew it, and such evidence, in our opinion, would tend to impugn the motive of defendant in trying to secure other forbidden lands, rather than palliate his conduct in so doing.

It is next urged that the court erred in excluding evidence of a custom prevailing in the vicinity where the offense was committed of entering upon land and immediately proceeding to cut timber therefrom before patent was obtained, and while proceedings to secure the same were pending, and that the custom was known to the general land office. This evidence of custom was offered in connection with an avowal by the defendant of his intention at the time he commenced cutting timber on the tract in question to purchase the same afterwards from the government. We entirely agree with the trial court that this evidence was incompetent. A general custom to violate the law cannot, on any principles of morality or law, justify itself. Neither can it justify an individual instance of violation of the law. Neither can knowledge of such violation by an agent of the United States excuse or justify it. If it were otherwise, then the register of the land office at Cheyenne, or any other agent of the government, and certainly the commissioner of the general land office at Washington, could annul any act of congress at pleasure. But it may be said these observations do not meet the argument that such custom, known to defendant, and acted upon by him, is evidence of an honest intent and purpose on his part in doing that which was customary. Every person is supposed and must be held to know the law. Any laxity in enforcing this axiomatic and fundamental rule would lead to endless disorder and crime. Teller, therefore, knew, or must be held to have known, that any such custom as is claimed in his behalf was an unlawful custom, amounting in and of itself to a violation of law, and it must also be held, in the light of the facts disclosed by this record, that any such custom, if lawful and competent in other cases, could not be of any avail to him, because, as just seen, he had already exhausted his full privilege of purchasing timber land under the act of 1878, and could not directly, in the manner prescribed by congress, or in any other manner, lawfully acquire any more. If

he could not do it directly or lawfully, it is impossible for us to conceive how he can shelter himself under a general custom, and thereby justify himself in the attempt to accomplish the same purpose indirectly and unlawfully.

In the case of U. S. v. Mock, 149 U. S. 273, 13 Sup. Ct. 848, 37 L. Ed. 732, the supreme court considered a case of trespass for cutting and carrying away timber from public lands. The trial court had charged the jury as follows:

"It is a matter of history that the government permitted the early pioneers, as they went ahead to make their homes for themselves, to go on the public domain, and take such timber as was necessary for domestic use; and, although there never was any law or license to that effect, it was done with knowledge of every department of the government, legislative, judicial, and executive. * * * While I wish you to understand that I am not aware of any license having ever been given in the last sixty years to any party to go on the public domain and cut timber, no court has ever held, and no court would be justified in holding, that these men were all criminals who went on and put up a little mill for the purpose of aiding their neighbors in procuring lumber for domestic purposes."

The court, speaking by Mr. Justice Brewer, commenting on the foregoing observations of the trial court, says:

"The specific portions [of the charge] to which the attention of the court was called at the time and exceptions taken are that which refers to the history of the attitude of the government towards pioneers and others who took timber from government lands for domestic use, and that which declared that no verdict could be returned in favor of the government except for the value of the lumber manufactured. In these there was obvious error. * * * Nor were the observations of the court in reference to the attitude of the government justifiable. Whatever propriety there might be in such a reference in a case in which it appeared that the defendant had simply cut timber for his own use, or the improvement on his own land, or development of his own mine (and in respect to that matter, as it is not before us, we express no opinion), there certainly was none in suggesting that the attitude of the government upheld or countenanced a party going into the business of cutting and carrying off timber from government land, manufacturing it into lumber, and selling it for profit."

The principles enunciated in that case are, in our opinion, irreconcilable with the claims of defendant's counsel in this case.

The defendant contends that the facts shown by the record that he endeavored, prior to cutting any timber on the land in question, to ascertain whether the land had been surveyed; that while at work cutting the timber he notified one Abbott, a special agent of the government, that he was so doing; that he received no notice to quit for three weeks thereafter,—constitute evidence of an honest purpose on his part, and should have been submitted to the jury on that issue. The principles hereinbefore discussed are, we think, entirely applicable to this last contention. The land was unquestionably unsurveyed public land, and, if defendant had prosecuted his alleged honest purpose far enough, he would have ascertained that fact. But whether he knew or could have known that it was unsurveyed public land was immaterial. All that he was required to know was that it was public land, surveyed or unsurveyed, and, if he knew that,—which unquestionably he did,—the fact that he endeavored to find out whether it was surveyed or not was quite immaterial; and certainly the toleration of a trespass for three

weeks—or for any time, for that matter—by a special agent of the government, whose duty it was not to tolerate it at all, can be of no avail to a trespasser by way of showing that his trespassing was done with an honest purpose.

So far we have treated the several contentions of defendant's counsel as if it was competent for him to disprove an actual bad purpose or evil intent; in other words, as if it was incumbent on the government to show a bad purpose or evil motive in the mind of the defendant in committing the trespass complained of. We have considered the excluded testimony on that theory (and even on that theory we have been unable to find any substantial error in the rulings of the court), but in so doing we have given the defendant the benefit of a position which, in our opinion, is unwarranted by the law. For the purpose of protecting the public domain from the invasion of trespassers, congress denounced as a crime the cutting of timber on public land "with the intent to export and dispose of the same." This is the intent that is made criminal by the law, and the only intent necessary to establish the crime in a given case. This intent is fully admitted in the present case. It is undisputed that the defendant cut the timber in question for the purpose of fulfilling a contract with the receivers of the Union Pacific Railroad Company for the delivery of 250,000 ties at Ft. Steele. It has been held by the supreme court in Stone v. U. S., 167 U. S. 188, 17 Sup. Ct. 778, 42 L. Ed. 127, that it is necessary in prosecutions under the statute now in question to prove a criminal intent, "or at least that [defendant] knew the timber to be the property of the United States." The elements of the offense charged against the defendant are three in number: (1) Cutting timber; (2) from land known to be public land; and (3) with intent to export or dispose of the same. These three elements concurring, the crime, in our opinion, is complete, and the jury would be fully justified in finding—and, indeed, it would be their duty to find—all the criminal intent required by the act.

The trial court charged the jury that, in order to convict, they must find that there existed in the mind of the defendant a "willful and wrongful purpose to obtain the timber in violation of the law." Taken by itself, this portion of the charge would have been misleading; but, taken in connection with other portions of the charge, to the effect that, if the defendant entered upon public land knowing it was such, without having complied with the provisions of the law giving him a right to do so, and cut timber therefrom, the jury would be authorized therefrom to find the requisite criminal intent, it fairly stated the law to the jury, and certainly as favorable to the defendant as he was entitled. The admission of the defendant at the trial that he had cut timber on 300 acres of unsurveyed government land to which he had no claim or color of title; the evidence of E. M. Johnston, register of the land office at Cheyenne, that he had informed the defendant, prior to his cutting the timber, that he could not acquire title to the lands, because they were not open to entry; the testimony tending to show that defendant promised his workmen, when they called his attention to the fact that the

lands were public lands, to stand between them and the government; and the further important fact that defendant had fully exhausted all his privileges of purchasing land under the stone and timber act,—all conduce to show, and, in our opinion, satisfactorily show, that defendant well knew the land was public land, and had all the criminal intent required by section 2461, Rev. St., and the act of June 3, 1878, to constitute the offense there denounced. In our opinion, none of the facts ·relied upon by him as evidence of an innocent intent or purpose were relevant or material to the case.

The next assignments of error relate to the cutting of timber by the defendant on the Montezuma placer claim, and arise on the following state of facts: One Mullison had been in possession of the Montezuma placer claim, working the same for the precious metals therein, for about 30 years prior to 1898, but he had never applied for a patent, or taken steps to acquire title from the United States prior to that day. In October of that year Mullison and the defendant entered into a contract by which it was agreed that defendant, in consideration of being permitted to cut all the tie timber growing thereon, should pay all the expenses, ·including the government price of $2.50 per acre, for securing a patent by Mullison to his claim. Pursuant to this agreement, Mullison, early in January, 1898, applied for a patent, and between that day and June 22, 1898, defendant proceeded to cut and did cut over about 300 acres of the claim, and advanced money amounting to about $2,000 for the payment of the expenses and purchase price of the land from the United States. On June 22, 1898, the payment was made, and Mullison secured a receiver's receipt for the same, entitling him in due course to a patent for the lands. The contention of defendant's counsel, based on several assignments of error relating to the exclusion of evidence and the court's charge, to which particular reference need not now be made, is that his cutting timber from this land after the application for a patent was made, and before the money was paid and a receiver's certificate secured, does not constitute an offense under the statutes of the United States. His proposition is that the ultimate payment of the money and securing the receiver's receipt conferred upon Mullison a title to the land, which, by relation, operated as of the date of the application, and in fact as of the time of his original location of the claim, and therefore that the cutting of timber at the time in question with the consent of Mullison constituted no violation of the laws of the United States. It may be conceded that the payment for the land conferred upon Mullison an equitable title to the same, which entitled him to a patent, and that he was not required to wait for the actual issue of a patent converting the equitable right into a legal title before exercising all the incidents of ownership. This, we think, is the law as established by the authorities (Witherspoon v. Duncan, 4 Wall. 210, 18 L. Ed. 839; Stark v. Starrs, 6 Wall. 402, 417, 18 L. Ed. 925; Deffeback v. Hawke, 115 U. S. 392, 405, 6 Sup. Ct. 95, 29 L. Ed. 423; Cornelius v. Kessel, 128 U. S. 456, 460, 9 Sup. Ct. 122, 32 L. Ed. 482; Railroad Co. v. Whitney, 132 U. S. 357, 361, 10 Sup. Ct.

112, 33 L. Ed. 363; Benson Mining & Smelting Co. v. Alta Mining & Smelting Co., 145 U. S. 428, 12 Sup. Ct. 877, 36 L. Ed. 762; Bardon v. Railroad Co., 145 U. S. 535, 12 Sup. Ct. 856, 36 L. Ed. 806; Bogan v. Mortgage Co., 11 C. C. A. 128, 63 Fed. 192), and the contention of the government in this case to the contrary is not well founded. The foregoing cases are, however, no authority for the proposition that lands cease to be public lands, or that a claimant secures an equitable right to a patent, until all the acts are performed and all the money is paid by the claimant, which are made by the law prerequisite to securing the legal title. Mullison, it appears, had located upon and worked his claim for some 30 years prior to 1898, and had thereby, under the mining laws, secured the right of possession to work the claim for precious metals as long as he desired to exercise that right, and had also acquired the option to apply for, and, on certain terms prescribed by law, to secure from the United States a patent conferring upon him title in fee simple to the lands contained in the claim, with all its incidental rights, privileges, and immunities. It is strenuously argued by defendant's counsel that the possessory title acquired by Mullison by virtue of the location, record, and working of his claim for so long a time segregated the same from the public domain, and conferred upon him such an equitable right as entitled him or his licensees to all the rights and incidents of absolute ownership. We cannot agree to any such proposition. Three separate rights or titles are recognized by the supreme court in and to public lands. In Benson Mining & Smelting Co. v. Alta Mining & Smelting Co., supra, the court quotes approvingly from an opinion of the secretary of the interior, as follows: "By the laws of the United States, three distinct classes of titles are created, namely: (1) Title in fee simple; (2) title by possession; (3) the complete equitable title." Title by possession is the first one in order of time acquired. Possession of a mining claim, in accordance with the provisions of the statute, by well-settled authority, confers the right, subject to certain limitations and conditions, upon a locator, to work the claim for precious metals for all time, if he desires to do so; but confers no right to take timber, or otherwise make use of the surface of the claim, except so far as it may be reasonably necessary in the legitimate operation of mining. The next right in order of time is the equitable one, already defined. The last one in the sequence is the perfect legal title in fee simple absolute, created by the issue of the patent by the United States. The claimant may be entirely satisfied with his possessory title, and be neither able nor willing to perform the further acts or pay the further consideration requisite to securing the equitable or legal title. For reasons of public policy, and for the purpose of encouraging the mining industry, the United States gratuitously grants the privilege to any citizen, or person having declared his intention to become a citizen, of locating a claim for mineral lands and working the same for precious metals; but it has not seen fit to give away the land containing the minerals, but, on the contrary, has adopted the policy of selling the same to the locator, if he desires to purchase, on terms fixed by the acts of congress.

Mullison's location, record, and working of his claim secured to him the possessory title only. While his location so far segregated and withdrew the land from the public domain that no rival claimant could successfully initiate any right to it until his location was avoided and his entry was canceled (James v. Iron Co., 46 C. C. A. 476, 107 Fed. 597, 603, and cases there cited; Hartman v. Warren, 22 C. C. A. 30, 76 Fed. 157, 160; Pacific Ry. Co. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566, 28 L. Ed. 1122), it gave him nothing but "the right of present and exclusive possession" for the purpose of mining. It did not devest the legal title of the United States, or impair its right to protect the land and its product, by either civil or criminal proceedings, from trespass or waste. While for the purpose of subsequent entry and location by private parties the lands which Mullison claimed were segregated from the public domain and appropriated to a private purpose, they were so segregated for that purpose only, and the legal and equitable title to them still remained in the government and they were still "lands of the United States" within the meaning of section 2461, Rev. St., and the act of August 4, 1892 (27 Stat. 348), which are under consideration in this case  Shiver v. U. S., 159 U. S. 491, 494, 16 Sup. Ct. 54, 40 L. Ed. 231. The case of Belk v. Meagher, 104 U. S. 279, 283, 26 L. Ed. 735, 737, relied on by defendant's counsel, clearly recognizes the limited character of the right conferred upon a locator. The court there says (page 283, 104 U. S., page 737, 26 L. Ed.):

"The language of the act is that the locators 'shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, which is to continue until there shall be a failure to do the requisite amount of work within the prescribed time.' Congress has seen fit to make the possession of that part of the public lands which is valuable for minerals separable from the fee, and to provide for the existence of an exclusive right to the possession, while the paramount title to the land remains in the United States."

The two titles recognized by the United States confer totally different rights. The first one confers a right (and it may properly enough be said to be vested in the locator) to the possession of the land for the purpose of carrying on his mining operations as long as he performs the required conditions. This, however, he may at any time abandon by ceasing to perform the conditions upon which it depends. The second is a complete and absolute title, which may or may not be acquired by the locator, and, if acquired, is for other and valuable considerations moving from him to the United States. This title is dependent upon no conditions, but confers all the rights incident to an indefeasible estate in fee simple. Considerations like the foregoing conclusively show that there is no warrant for the contention that the locator's right of possession segregates the land from the public domain, and appropriates it to a private purpose in any such way as to withdraw it from the effect of the provisions of the criminal statutes under which the defendant was convicted. After the locator shall have applied for a patent, in the event in the exercise of his option he sees fit to do so, and after he shall have fully perfected his entry upon the land by the

payment of the purchase price, and not till then, has the land ceased to be a part of the public domain, and not till then has he acquired any vested right to the absolute title. Witherspoon v. Duncan, supra. When such an entry is made, the land is not only withdrawn from the public domain, but the entryman has acquired an equitable title, and thereafter, and not till then, the United States holds the legal title in trust for him.

This brings us to a consideration of the effect to be given to the application for a patent made by Mullison on January 5, 1898, and to the perfection of his entry by payment of the purchase price on June 22, 1898. Between these dates the trespass charged against the defendant was committed. Counsel strenuously urge that Mullison's actual payment for the land on June 22, 1898, and securing the receiver's certificate of such payment, conferred title on him by relation certainly as of January 5, 1898, when he applied for the patent. The argument need not here be repeated, nor the authorities again referred to, showing that the payment for the land and securing the receiver's receipt therefor operated to create a perfect equitable title in Mullison. "The equitable title accrues immediately upon purchase, for the entry entitles the purchaser to a patent, and the right to a patent once vested is equivalent to a patent issued." Benson Mining & Smelting Co. v. Alta Mining & Smelting Co., supra. But does this title relate to or become effective as of any day prior to the actual payment of the purchase price in any such sense as to entitle the applicant for a patent, or any one acting under or by his authority, to enter upon the land in the meantime, and appropriate the timber to his or their own use? The application for a patent in and of itself imposes no obligation upon the applicant to pursue his purpose to secure a patent. It is only the first step to that end. He is afterwards required by the mining laws to perform certain other prerequisite duties, and particularly to make payment for the land and secure the receiver's receipt therefor. At any time prior to the actual payment it is within the power of the applicant to abandon his purpose. Can it be possible that congress intended to open the door to such depredation and fraud as would be feasible on defendant's theory? According to it, Mullison might have made a formal application for a patent, proceeded to sell and dispose of the timber growing on the land, impairing its value accordingly, and then, without penalty, have abandoned his entry, leaving the land wasted, and stripped of its timber, which might have been its chief value, for the government to hold without the probability of sale. Unless congress by clear and unambiguous expression of its will has left this door open, we will not open it. We not only fail to find any such expression of legislative intent, but authority and reason alike conduce to the contrary. In U. S. v. Nelson, 5 Sawy. 68, Fed. Cas. No. 15,864, a case much like the present was considered. A locator of a placer claim had taken all the steps entitling him to a patent for the land, except the final payment of the price fixed by law. Afterwards he cut timber therefrom, not incidental to a bona fide mining operation, but for the purpose of selling it as firewood. The

court held that this constituted an offense, within the meaning of section 2461, supra, and among other things said:

"The defendant in this case occupies the premises under this law, and claims the right to cut and remove the timber therefrom as incidental to and in aid of his right to mine thereon; but he is not the owner of the land until he pays for it and obtains the United States patent. It is a part of the public domain. In the meantime the defendant is occupying it under a more license from the government, which may be revoked at any time by the repeal of the act giving it. * * * If the land, or the greater portion of it, is of little or no value as mining ground, but valuable for its timber, the defendant might occupy it for a few years until he had stripped the tract of its timber and worked out the few acres that really contained valuable deposits, and then abandon it to the government. * * * The temptation to locate 160 acres of timber land as mining ground, and by putting a few dollars worth of labor upon it annually, and thereby be enabled to dispose of the timber upon it at from $50 to $100 an acre is very great; and, if the defendant's construction of the law is to obtain, there is nothing to prevent its being done. * * * The removal of timber from a mining claim, to be justifiable, should proceed pari passu with the operation of mining. Whoever wants to go further or faster than this, and for any reason appropriate the timber to his own use in advance of his mining operations, can only do so safely by paying the purchase price of the land and becoming the owner thereof."

The views so expressed by the district judge in that case commend themselves to our reason, and, it appears, so commended themselves to the reason of the supreme court of the United States that that court cites it in support of its decision in the case of Shiver v. U. S., supra.

The law relating to the acquisition of homesteads is so akin to that relating to the acquisition of mineral claims that the principles governing the rights of claimants while engaged in perfecting their titles are conceded by counsel in their argument to be similar. The homestead settler acquires no title until five years after his entry. During these years he must, among other things, reside upon the land entered, and cultivate the same. The performance of such acts, like the final payment by a claimant of mineral land, entitles him to a patent. In homestead cases the rule is well settled that the settler may cut during those five years only such timber as is reasonably incidental to cultivation, and cannot, under color of exercising this right, denude the land of its timber for the purpose of selling the same and securing its purchase price. Stone v. U. S., 167 U. S. 178, 17 Sup. Ct. 778, 42 L. Ed. 127; Shiver v. U. S., 159 U. S. 491, 16 Sup. Ct. 54, 40 L. Ed. 231; U. S. v. Cook, 19 Wall. 591, 22 L. Ed. 210; Conway v. U. S., 37 C. C. A. 200, 95 Fed. 615; Grubbs v. U. S., 44 C. C. A. 513, 105 Fed. 314. In the case of Shiver v. U. S., supra, the question turned upon what is meant by "land of the United States" within the meaning of section 2461, Rev. St., providing for the punishment of persons guilty of cutting timber upon such lands. After making a résumé of the provisions of the homestead act, Mr. Justice Brown, speaking for the court, says:

"It is evident: First, that the land entered continues to be the property of the United States for five years following the entry; * * * second, that such property is subject to divestiture upon proof of the continued residence of the settler upon the land for five years; third, that meantime such settler has the right to treat the land as his own so far, and so far

only, as is necessary to carry out the purposes of the act. The object of this legislation is to preserve the right of the actual settler, but not to open the door to manifest abuses of such right. Obviously, the privilege of residing on the land for five years would be ineffectual if he had not also the right to build himself a house, outbuildings, and fences, and to clear the land for cultivation; and to that extent the act limits and modifies the act of 1831, now embraced in Rev. St. § 2461. It is equally clear that he is bound to act in good faith to the government, and that he has no right to pervert the law to dishonest purposes, or to make use of the land for profit or speculation. The law contemplates the possibility of his abandoning it, but he may not in the meantime ruin its value to others, who may wish to purchase or enter it. * * * The settler upon a homestead may cut such timber as is necessary to clear the land for cultivation, or to build him a house, outbuildings, and fences, and, perhaps, as indicated in the charge of the court below, to exchange such timber for lumber to be devoted to the same purposes, but not to sell the same for money, except so far as the timber may have been cut for the purpose of cultivation."

The supreme court in the last-mentioned case cites a large number of cases determined in courts of original jurisdiction wherein views were expressed in harmony with those stated by the court, and finally concludes that the land of a settler for homestead purposes "remained the lands of the United States, within the meaning of 2461, supra," until the settler had acquired the right to a patent by the performance of all the conditions necessary under the law to the acquisition of such title.

In our opinion, the principles announced in the last-cited case, as well as those recognized or announced in other cases above cited, control the determination of this case, and require us to hold that the defendant, Teller, cannot justify his cutting of the timber in question under license from Mullison prior to the payment by him to the United States of the purchase price of the land from which the cutting was done.

We have not, in the foregoing opinion, deemed it necessary to take up the assignments of error seriatim, but have adopted the course of discussing the principles contended for, believing that in so doing we could in a general way dispose of the assignments of error more satisfactorily than by considering each separately. The conclusions reached dispose of each and all of the assignments of error adversely to the defendant, and result in an affirmance of the judgment.

The verdict was a general one, and it cannot be ascertained from the record whether the jury found the defendant guilty of unlawfully cutting timber from the unsurveyed lands, or from the Montezuma placer, or from both, but the conclusion reached demonstrates that there was no error on either hypothesis. The undisputed facts show that the defendant intentionally cut growing timber from the lands in question, knowing at the time of so doing that they were public lands belonging to the United States; and, finding no error prejudicial to the defendant, either in the admission or rejection of evidence, or in the charge to the jury, the judgment of the trial court must be affirmed.