UNITED STATES of America,
Plaintiff-Appellee,

v.

Ned N. RICHARDSON and Dorothy M.
Richardson, husband and wife,
Defendants-Appellants.

No. 77-2580.

United States Court of Appeals,
Ninth Circuit.

May 11, 1979.

Rehearing Denied July 9, 1979.

William B. Murray, Portland, Or., for defendants-appellants.

James W. Moorman, John H. Harmon, Asst. Attys. Gen., Washington, D. C., for plaintiff-appellee.

Before WRIGHT and GOODWIN, Circuit Judges, and THOMPSON,* District Judge.

BRUCE R. THOMPSON, District Judge:

Some form of poetic justice may lie in the fact that this action arose in the Gifford Pinchot National Forest in the State of Washington, named for a man who was in the vanguard of conservationists and environmentalists.

In 1970 the appellants, Ned and Dorothy Richardson, filed notices of location for six mining claims in the Wind River Ranger District. The claims were situated at the confluence of Slide Creek and the East Fork of the Lewis River, an area reforested after a destructive fire some forty years ago. The area was heavily used by campers and fishermen.

Appellants explored and prospected their claims by use of heavy equipment (a bulldozer and a backhoe) and by blasting. Surface disturbance by bulldozing of three separate areas affected approximately 1.6 acres. Two trenches were excavated, one approximately 75 feet by 65 feet by twelve feet deep; the other approximately 300 feet by 100 feet by 15 feet deep. From the early days of these activities forest rangers remonstrated with the Richardsons respecting the excessive and unnecessary surface and environmental damage caused by their methods of prospecting and suggested core drilling as an alternative, but the suggestions were not heeded. Ultimately this action was filed to enjoin further blasting and bulldozing and to restore surface damage.

---

* The Honorable Bruce R. Thompson, United States District Judge, District of Nevada, sitting by designation.

To place this case in proper perspective it should be said that these were genuine prospecting activities conducted at considerable expense (some $40,000) for the purpose of developing a mine. The Richardsons used the methods they deemed best for the purpose of removing the overburden and uncovering the ore body. Inasmuch as the prospect was, at best, a low grade copper deposit, it was essential to demonstrate the existence of a large body of ore for commercially feasible mining. The report of the government's own expert geologist states: "The prospect does justify continued exploration which should be designed to indicate the presence of commercial grade ore . . . ." The report also stated:

"The goal of a successful exploration effort on a deposit such as this will be to delineate sufficiently large tonnages of 0.6–0.8% copper equivalent rock which would be amenable to open pit or block caving mining methods. Using the above grades as one economic parameter, a minimum size deposit of 30,000,000 tons would justify probable production at 5,000 to 7,500 TPD. This size deposit would represent a volume block of 330,-000,000 cu. ft. or 1,000' $\times$ 1,000' $\times$ 330' basic dimensions. The only acceptable initial approach to exploration of this type deposit would be core drilling after performance of all applicable surface geotechnical surveys. Small area excavations are virtually meaningless for this type of problem. Furthermore, the large tonnage minimum production rate requirement for ore of concentrator quality indicates that small-scale production is totally economically unacceptable. The ASARCO smelter in Tacoma would not accept the low-grade raw ore; only clean contract-stipulated concentrates and/or adequate flux to meet their environmental quality standards."

Following a court trial during which the district judge viewed the premises, the Court entered its decree and found:

"1. This Court has jurisdiction by virtue of 28 U.S.C. § 1345.

"2. Stripping away over burden to expose rockbed, particularly in the initial exploration stages, is not proper mining procedure, under the circumstances shown by the evidence in this case.

"3. Defendants' utilization of blasting and bulldozing was destructive to the surface resources and consequently not a reasonable method of exposing subsurface deposits under the circumstances shown by the evidence in this case.

"4. Under the circumstances shown by the evidence in this case, the Forest Service may require the locator of an unpatented mining claim on national forest lands to use nondestructive methods of prospecting.

"5. Defendants and their successors and agents, servants, employees and attorneys, and those persons in active concert or participation with them are permanently enjoined from conducting prospecting operations by means of bulldozing or blasting on the following mining claims located in Sections 7, 8, 15, 17, 18 and 20, Township 4 North, Range 5 E.W.M., in Skamania County, Washington: Half Penny, Silver Lode No. 1, Big Twinkle Mine, Richardson Lodge Claim, Richardson Little Twinkle Mine, and Lucky Strike.

"Plaintiff shall have judgment against defendants Ned N. Richardson and Dorothy M. Richardson jointly and severally in the amount of $2,263.13 plus its costs and disbursements herein."

This case involves the interrelationship of federal statutes concerning the national forests and mining on public lands. These are 30 U.S.C. § 26, 30 U.S.C. § 612,[1] 16

1. 30 U.S.C. § 612: Unpatented mining claims.
(a) Prospecting, mining or processing operations
Any mining claim hereafter located under the mining laws of the United States shall not be used, prior to issuance of patent therefor, for any purposes other than prospecting, mining or

processing operations and uses reasonably incident thereto.
(b) Reservations in the United States to use of the surface and surface resources
Rights under any mining claim hereafter located under the mining laws of the United States shall be subject, prior to issuance of

U.S.C. § 551,[2] and 16 U.S.C. § 478.[3] Since 1897 the Secretary of Agriculture has had authority under sections 478 and 551 of Title 16 to promulgate regulations concerning the methods of prospecting and mining in national forests; yet it was not until 1974 that such regulations were adopted. (35 C.F.R. Part 252). No such regulations were in effect before this lawsuit was commenced in November, 1973 and the forest rangers relied on certain directives and guidelines issued by the department and upon 30 U.S.C. § 612 for their authority to restrain the unwarranted surface destruction of the national forest.

The basic mining law of May 12, 1872 (17 Stat. 91) granted a locator broad possessory rights. "The locators of all mining loca-

patent therefor, to the right of the United States to manage and dispose of the vegetative surface resources thereof and to manage other surface resources thereof (except mineral deposits subject to location under the mining laws of the United States). Any such mining claim shall also be subject, prior to issuance of patent therefor, to the right of the United States, its permittees, and licensees, to use so much of the surface thereof as may be necessary for such purposes or for access to adjacent land: Provided, however, That any use of the surface of any such mining claim by the United States, its permittees or licensees, shall be such as not to endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto: Provided further, That if at any time the locator requires more timber for his mining operations than is available to him from the claim after disposition of timber therefrom by the United States, subsequent to the location of the claim, he shall be entitled, free of charge, to be supplied with timber for such requirements from the nearest timber administered by the disposing agency which is ready for harvesting under the rules and regulations of that agency and which is substantially equivalent in kind and quantity to the timber estimated by the disposing agency to have been disposed of from the claim: Provided further, That nothing in this subchapter and sections 601, 603 of this title shall be construed as affecting or intended to affect or in any way interfere with or modify the laws of the States which lie wholly or in part westward of the ninety-eighth meridian relating to the ownership, control, appropriation, use, and distribution of ground or surface waters within any unpatented mining claim.
(c) Severance or removal of timber

Except to the extent required for the mining claimant's prospecting, mining or processing operations and uses reasonably incident thereto, or for the construction of buildings or structures in connection therewith, or to provide clearance for such operations or uses, or to the extent authorized by the United States, no claimant of any mining claim hereafter located under the mining laws of the United States shall, prior to issuance of patent therefor, sever, remove, or use any vegetative or other surface resources thereof which are subject to management or disposition by the United States under subsection (b) of this section.

Any severance or removal of timber which is permitted under the exceptions of the preceding sentence, other than severance or removal to provide clearance, shall be in accordance with sound principles of forest management.

**2.** 16 U.S.C. § 551: Protection of national forests; rules and regulations.

The Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests which may have been set aside or which may be hereafter set aside under the provisions of section 471 of this title, and which may be continued; and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction; and any violation of the provisions of this section, sections 473 to 478 and 479 to 482 of this title or such rules and regulations shall be punished by a fine of not more than $500 or imprisonment for not more than six months, or both. Any person charged with the violation of such rules and regulations may be tried and sentenced by any United States magistrate specially designated for that purpose by the court by which he was appointed, in the same manner and subject to the same conditions as provided for in section 3401(b) to (e) of Title 18.

**3.** 16 U.S.C. § 478: Egress or ingress of actual settlers; prospecting.

Nothing in sections 473 to 478, 479 to 482 and 551 of this title shall be construed as prohibiting the egress or ingress of actual settlers residing within the boundaries of national forests, or from crossing the same to and from their property or homes; and such wagon roads and other improvements may be constructed thereon as may be necessary to reach their homes and to utilize their property under such rules and regulations as may be prescribed by the Secretary of Agriculture. Nor shall anything in such sections prohibit any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof. Such persons must comply with the rules and regulations covering such national forests.

tions . . . shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations . . . " (30 U.S.C. § 26). Before 1955 this broad grant was consistently recognized so long as the uses were incident to prospecting and mining. In *United States v. Rizzinelli*, 182 F. 675 (D.Idaho 1910), the establishment and maintenance of saloons on an unpatented mining claim in the forest reserve was held to be an indictable offense. The court said:

"The paramount ownership being in the government, and it also having a reversionary interest in the possessory right of the locator, clearly has a valuable estate which it is entitled to protect against waste and unlawful use."

Also, in *Teller v. United States*, 113 F. 273 (8th Cir. 1901), the defendant was convicted of unlawfully cutting and exporting timber from public lands of the United States, including from an unpatented mining claim. Upholding the conviction, the Court of Appeals said, in part:

"While his location so far segregated and withdrew the land from the public domain that no rival claimant could successfully initiate any right to it until his location was avoided and his entry was canceled (*James v. Iron Co.*, 46 C.C.A. 476, 107 Fed. 597, 603, and cases there cited; *Hartman v. Warren*, 22 C.C.A. 30, 76 Fed. 157, 160; *Pacific Ry. Co. v. Dunmeyer*, 113 U.S. 629, 5 S.Ct. 566, 28 L.Ed. 1122), it gave him nothing but 'the right of present and exclusive possession' for the purpose of mining. It did not devest the legal title of the United States, or impair its right to protect the land and its product, by either civil or criminal proceedings, from trespass or waste."

The foregoing statement was quoted with approval by our court in *United States v. Nogueira*, 403 F.2d 816 (9th Cir. 1968) where we upheld the right of the United States to seek to enjoin the use of an unpatented mining claim for a residence wholly unrelated to any mining activity whatsoever. Similarly, in *United States v. Etcheverry*, 230 F.2d 193 (10th Cir. 1956), the owner of unpatented mining claims was held not

entitled to lease the claims for grazing of livestock—a use unrelated to mining. See also: *United States v. Schultz*, 31 F.2d 764 (N.D.Cal.1929).

It perhaps is not surprising that the reported cases to this date concerning the surface use of unpatented mining locations have treated only the issue of uses unrelated to prospecting and mining. This is true even of the precedents since 1955, after the passage of the Surface Resources Act of 1955, 69 Stat. 367, and particularly 30 U.S.C. § 612 (supra). *Converse v. Udall*, 262 F.Supp. 583 (D.Or.1966), aff'd 399 F.2d 616 (9th Cir. 1968), cert. den. 393 U.S. 1025, 89 S.Ct. 635, 21 L.Ed.2d 569 (1969), arose out of an administrative action by the Secretary against locators to establish control of the surface resources (timber) on unpatented mining claims. In *United States v. Toole*, 224 F.Supp. 440 (D.Mont.1963) the United States brought an action to cancel mining locations and obtain damages for trespass. The court held that a deposit of peaty material or peat moss was not a valuable mineral locatable under the mining laws and awarded damages under 30 U.S.C. § 612 to the United States for the material removed. The case of *United States v. Curtis-Nevada Mines, Inc.*, 415 F.Supp. 1373 (E.D.Cal.1976), involved the surface use of unpatented mining claims located both in the national forest under the jurisdiction of the Department of Agriculture, and on public lands under the jurisdiction of the Department of Interior. The court required the defendant to file an operations plan for the unpatented claims located in the national forest pursuant to 36 C.F.R. Part 252, but not for the claims on lands under the jurisdiction of the Bureau of Land Management which had promulgated no similar regulation. The court also enjoined the defendant from prohibiting or interfering with public use of the surface of the claims for hunting, hiking, camping and recreational activities "so long as there is no interference with ongoing mining operations."

The Surface Resources Act of July 23, 1955, 69 Stat. 367, 30 U.S.C. § 611, et seq. (Footnote 1), must be relied upon to uphold the decree of the District Court in the present case. The year following its enact-

294

ment, the Secretary of Interior promulgated regulations (21 F.R. § 7619, 43 C.F.R. § 185.120, et seq.). Section 185.122 of the regulations (now renumbered and found as 43 C.F.R. § 3712.1)[4] sets forth the Secretary's interpretation of the statute in relation to the surface use of unpatented mining claims on public lands under the jurisdiction of the BLM. A fair reading of this regulation must lead to the conclusion that insofar as BLM lands are involved, any activity is permissible which is directly related to mining or prospecting.

These regulations do not, however, apply to national forest lands under the jurisdiction of the Secretary of Agriculture and in

4. 43 C.F.R. § 3712.1:

.    .    .    .    .

(b) The locator of an unpatented mining claim subject to the act is limited in his use of the claim to those uses specified in the act, namely, prospecting, mining, or processing operations and uses reasonably incident thereto. He is forbidden to use it for any other purpose such, for example, as for filling stations, curio shops, cafes, tourist, or fishing and hunting camps. Except as such interference may result from uses permitted under the act, the locator of an unpatented mining claim subject to the act may not interfere with the right of the United States to manage the vegetative and other surface resources of the land, or use it so as to block access to or egress from adjacent public land, or use Federal timber for purposes other than those permitted under the act, or block access to water needed in grazing use of the national forests or other public lands, or block access to recreational areas, or prevent agents of the Federal Government from crossing the locator's claim in order to reach adjacent land for purposes of managing wild-game habitat or improving fishing streams so as to thwart the public harvest and proper management of fish and game resources on the public lands generally, both on located and on adjacent lands.

5. Testimony taken in hearings before the Committee on Interior and Insular Affairs on S 1713:
MR. WOOZLEY. Under present uses, I feel very definitely that some people are taking advantage of using the surface rights for purposes not incident actually to mining.
SENATOR MILLIKIN. Give me examples.
MR. WOOZLEY. I think your bulldozer examples out in New Mexico and probably in Arizona and Colorado and Wyoming, in the exploration for uranium, is one very good example.
SENATOR MILLIKIN. What are they doing?

the instant case we look to Title 30 U.S.C. § 612 unaided and unimpeded by administrative regulation. The court observed in *United States v. Curtis-Nevada Mines, Inc.* (supra) that the statute is ambiguous and we must look to legislative history for aid in interpretation.

Testimony taken in hearings before the Committee on Interior and Insular Affairs on § 1713, a bill whose language was identical to that adopted as 30 U.S.C. § 612, indicates that the Congress was aware of the problem of excessive bulldozing.[5]

Further, in commenting on section 4(c) of 69 Stat. 368 (30 U.S.C. § 612), the House Committee considering the bill stated:

MR. WOOZLEY. They are stripping the land in certain areas much more than is necessary for their actual mining operations, destroying the topsoil and allowing the wind to blow the land around.

.    .    .    .    .

SENATOR ANDERSON.  .  .  .  We are having an epidemic of bad erosion practices by taking the bulldozers and just promiscuously running them across the landscape.
SENATOR MALONE. Do you mean, Mr. Woozley, that there is a great percentage of the area of these lands that is being bulldozed in that connection?
MR. WOOZLEY. There is sufficient, Senator, when you dig a hole on each claim or use a bulldozer on each claim, that it is setting up a terrific erosion problem. The Federal Government and the people using the range are spending money to build and vegetate these ranges, and, on the other hand, they are being abused.
SENATOR MALONE. Would you stop all this?
MR. WOOZLEY. We would have a much better chance of stopping that under this act than under the existing laws.
SENATOR MALONE. I ask you, would you attempt to stop it? Do you want to stop it?
MR. WOOZLEY. We would stop the uses which are not necessary to exploration.
SENATOR MALONE. What is he using the bulldozer for? Is it not to find out what is underneath?
MR. WOOZLEY. That is very questionable. It is just to do his assessment work, his necessary work. I do not think it is doing anything to determine what minerals are there, Senator.
SENATOR MALONE. Are we not then amending the wrong law?

.    .    .    .    .

MR. WOOZLEY. No. I think this law would do that.
(Testimony of Mr. Woozley, Director of the Bureau of Land Management, page 65.)

"This language, read together with the entire section, emphasizes recognition of the dominant right to use in the locator but strikes a balance in the view of the committee, between competing surface uses and surface versus subsurface uses."

Section 612 speaks of "prospecting", "mining" and uses "reasonably incident thereto." It speaks of "the right of the United States to manage and dispose of the vegetative resources thereof and to manage other surface resources thereof." It limits such control so "as not to endanger or materially interfere with prospecting, mining . . . or uses reasonably incident thereto." It also in subsection (c) precludes the exploitation of surface resources by a locator "except to the extent required for . . prospecting, mining . . . and uses reasonably incident thereto." (Emphasis supplied.) Bearing in mind that this admittedly ambiguous restatement of the rights of mining locators was intended to supersede and modify the pre-existing recognition of broad rights under 30 U.S.C. § 26 (discussed supra), we think the words we have underlined in the quoted extracts from the statute are the ones that point the direction of the changes intended. The findings of fact by the District Court implement a correct interpretation of the statute, are supported by the evidence, and cannot be faulted under the standard prescribed by Rule 52(a) Fed.R.Civ.P.

Congressional policy as expressed in the National Environmental Policy Act of 1969 is also consistent with this disposition.[6]

In summary, we suggest that each case of this kind is controlled by the facts of each particular case. The District Court in its findings emphasized and reiterated the "circumstances shown by the evidence in this case." Here the locators did not have a mine, they had a prospect, they were still exploring. Their methods of exploration were unnecessary and were unreasonably destructive of surface resources and damaging to the environment. They were warned and persisted. The judgment of the District Court is affirmed.

**6.** The National Environmental Policy Act of 1969 (NEPA) also indicated that the Congress intended the various agencies of government to take a greater interest in environmental problems. NEPA provides in part:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations and public laws of the United States shall be interpreted and administered in accordance with the policy set forth in this Act . . . ." 42 U.S.C. § 4332.

These policies as set forth in 42 U.S.C. § 4331 et seq. include a duty to:

"(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

"(2) assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings;

"(3) attain the widest range of beneficial uses of the environment without degradation risk to health or safety or other undesirable and unintended consequences . . .

"The Congress recognizes that each person should enjoy a healthful environment and each person has a responsibility to contribute to the preservation and enhancement of the environment."