**UNITED STATES of America,
Plaintiff,**

v.

**Quentin H. GOOD, Defendant.**

**No. CIV.A. 02–7022 M.**

United States District Court,
D. Colorado.

April 16, 2003.

Pamela R. Mackey, Haddon, Morgan, Mueller, Jordan, Mackey & Foreman, PC, Denver, CO, Richard N. Stuckey, Richard N. Stuckey, P.C., Denver, CO, for Defendant.

George E. Gill, United States Attorney's Office, Denver, CO, for U.S.

## MEMORANDUM OF DECISION AND ORDER

BOLAND, United States Magistrate Judge.

Quentin Good is the locator of an unpatented mining claim known as the Dreamtime Mine. He is charged by a Second Amended Information with six counts of violating federal regulations governing the use of United States Forest land. Specifically, Mr. Good is charged with the following:

Count I: On or about March 16, 2001, damaging a natural feature or other property of the United States by digging a trench with a mechanized backhoe without authorization or approval, and aiding, abetting, and inducing another in the commission of this offense, in violation of 36 C.F.R. § 261.9(a);

Count II: On or about April 25, 2001, damaging a natural feature or other property of the United States by digging a trench with a mechanized backhoe without authorization or approval, and aiding, abetting, and inducing another in the commission of this offense, in violation of 36 C.F.R. § 261.9(a);

Count III: On or about September 25, 2001, damaging a natural feature or other property of the United States by digging a trench with a mechanized backhoe without authorization or approval, and aiding, abetting, and inducing another in the commission of this

offense, in violation of 36 C.F.R. § 261.9(a);

Count IV: On or about November 21, 2000, threatening, resisting, intimidating, and interfering with a Forest Service officer in the performance of her official duties, in violation of 36 C.F.R. § 261.3(a);

Count V: Between September 25, 2001, and October 8, 2002, damaging a natural feature or other property of the United States by digging a trench with a mechanized backhoe without authorization or approval, in violation of 36 C.F.R. § 261.9(a); and

Count VI: Between September 25, 2001, and October 8, 2002, constructing, placing, and maintaining an A-frame structure on National Forest land without a special use authorization, contract, or approved operating plan, in violation of 36 C.F.R. § 261.10(a).

■ Each of the counts charged is a Class B misdemeanor. 18 U.S.C. § 3559(a)(7); 36 C.F.R. § 261.1b. A Class B misdemeanor is a petty offense. 18 U.S.C. § 19. There is no right to a jury trial where the charge is a petty offense, Fed.R.Crim.P. 58(b)(2)(F); consequently, I conducted a bench trial of the charges against Mr. Good on April 8–10, 2003. Although not requested to do so by the parties, this Memorandum of Decision and Order contains specific findings of fact consistent with the provisions of Fed. R.Crim.P. 23(c). *See United States v. Unser,* 165 F.3d 755, 760 and n. 3 (10th Cir. 1999).

## I.

This case, like many before it, involves a conflict between the rights of an individual to prospect and develop mineral resources on public lands, and the power and duties of the United States Forest Service to manage the surface resources of the National Forests. *See, e.g., United States v. Etcheverry,* 230 F.2d 193 (10th Cir.1956); *United States v. Shumway,* 199 F.3d 1093 (9th Cir.1999); *United States v. Brunskill,* 792 F.2d 938 (9th Cir.1986); *United States v. Richardson,* 599 F.2d 290 (9th Cir.1979); *Teller v. United States,* 113 F. 273 (8th Cir.1901). "[T]he important interest in developing mineral resources on public lands under the mining law may come into conflict with the equally important interest in protecting our National Forests for future use." *Brunskill,* 792 F.2d at 939.

To be fully understood, the charges against Mr. Good must be considered in view of the following historical and legal backdrop:

The statutory right to mine on public lands is long-standing. The Mining Law of 1872 provides:

[A]ll valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States and those who have declared their intention to become such, under regulations prescribed by law, and according to the local customs or rules of miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States.

30 U.S.C. § 22. The 1872 Act also reserves to a mineral claimant "the exclusive right of possession and enjoyment of all surface included within the lines of their locations." *Id.* at § 26.

The rights of miners to use public lands were affected by the Organic Administration Act of 1897, which established the National Forest system and authorized the Secretary of Agriculture to promulgate

rules and regulations to protect those forest lands from destruction and depredation. 16 U.S.C. §§ 478 and 551; *see United States v. Richardson,* 599 F.2d at 292. Particularly relevant here is section 551, which provides:

> The Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests which may have been set aside or which may hereafter be set aside under the provisions of section 471 of this title, and which may be continued; and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use to preserve the forests thereon from destruction. . . .

16 U.S.C. § 551.

Thus, the Secretary of Agriculture since 1897 has had the authority to promulgate regulations concerning the methods of prospecting and mining in national forests. *United States v. Langley,* 587 F.Supp. 1258, 1264 (E.D.Cal.1984). Under that authority, regulations were promulgated on August 28, 1974, which now appear at 36 C.F.R. Part 228. *Id.*

Despite the language of the 1872 Mining Act that claimants "shall have the exclusive right of possession and enjoyment of all [the] surface," courts have limited those rights to uses reasonably related to mining operations. 2 *American Law of Mining* § 34.02[3] at p.34–8 (Rocky Mountain Mineral Law Foundation ed., 2002). For example, in *Teller v. United States,* 113 F. 273 (8th Cir.1901), the defendant was convicted of a crime of unlawfully cutting and exporting timber from public lands of the United States, including from an unpatented mining claim. In affirming the conviction, the court of appeals said:

> While [the defendant's] location [of an unpatented claim] so far segregated and withdrew the land from the public domain that no rival claimant could successfully initiate any right to it until his location was avoided and his entry was cancelled, . . . it gave him nothing but "the right of present and exclusive possession" *for the purpose of mining.* It did not divest the legal title of the United States, or impair its right to protect the land and its product, either by civil or criminal proceedings, from trespass or waste.

*Id.* at 281 (emphasis added; internal citations omitted).

More recently, the Tenth Circuit Court of Appeals held in *United States v. Etcheverry,* 230 F.2d 193, 195 (10th Cir.1956), that the locator of an unpatented mining claim is not entitled to lease the surface of the claim for grazing of livestock, stating:

> The right of the locator [of an unpatented mining claim] to use the surface for purposes other than for mining, or the right to dispose of timber, grass or other materials on or under the surface of the lands was not under consideration. We construe these cases to hold that the exclusive possession of the surface of the land to which the locator is entitled *is limited to use for mining purposes.*

(Emphasis added.) *Accord United States v. Bagwell,* 961 F.2d 1450 (9th Cir.1992)(affirming the eviction of a mill site claimant holding under an unpatented claim where the site was used "primarily for residence and livestock purposes rather than mining or milling purposes"); *United States v. Nogueira,* 403 F.2d 816 (9th Cir.1968)(holding that the United States may prevent the holder of an unpatented mining claim from using the surface for a residence wholly unrelated to any mining activity whatsoever).

The rights of miners on public lands also were affected by the enactment of the

Multiple Surface Use Act of 1955. That Act provides in relevant part:

**(a) Prospecting, mining or processing operations**

Any mining claim hereafter located under the mining laws of the United States shall not be used, prior to issuance of patent therefor, for any purposes other than prospecting, mining or processing operations and uses reasonably incident thereto.

**(b) Reservations in the United States to use of the surface and surface resources**

Rights under any mining claim hereafter located under the mining laws of the United States shall be subject, prior to issuance of patent therefor, to the right of the United States to manage and dispose of the vegetative surface resources thereof and to manage other surface resources thereof (except mineral deposits subject to location under the mining laws of the United States).

30 U.S.C. § 612.

The Multiple Surface Use Act did not change the basic principles of the mining laws. *United States v. Curtis–Nevada Mines, Inc.*, 611 F.2d 1277, 1280 (9th Cir. 1980). Instead, it codified previous court decisions, including *Teller* and *Etcheverry,* by statutorily precluding uses of mining claims, prior to the issuance of a patent, for any purposes other than prospecting, mining, or processing operations, and uses reasonably incident to those purposes. 1 *American Law of Mining, supra,* § 32.01 at p.32–4. As the court explained in the *Curtis–Nevada Mines* case:

The Multiple Use Act was corrective legislation, which attempted to clarify the law and to alleviate abuses that had occurred under the mining laws.

\* \* \* \* \* \*

In order to obtain the patent the claimant would have to establish that there was a legitimate discovery of a valuable

mineral deposit on the land which a prudent man would be justified in developing. In many instances an investigation and hearing would be required prior to granting a patent. However, claimants could continue mining activities on the claims, without ever obtaining a patent. As a practical matter, mining claimants could remain in exclusive possession of the claim without ever proving a valid discovery or actually conducting mining operations. This led to abuses of the mining laws when mining claims were located with no real intent to prospect or mine but rather to gain possession of the surface resources. . . .

It was to correct this deficiency in the mining law that Congress in 1955 enacted to Multiple Use Act. Some of the abuses and problems that the legislation was designed to correct are detailed in House Report 730:

\* \* \* \* \* \*

"Under existing law, fishing and mining have sometimes been combined in another form of nonconforming use of the public lands: a group of fisherman-prospectors will locate a good stream, stake out successive mining claims flanking the stream, post their mining claims with 'No trespassing' signs, and proceed to enjoy their own private fishing camp. So too, with hunter-prospectors, except that their blocked-out 'mining claims' embrace wildlife habitats; posted, they constitute excellent hunting camps."

611 F.2d at 1280–82 (quoting H.R.Rep. No. 730 at 6, U.S.Code Cong. & Admin. News, pp. 2478–79). *Accord United States v. Shumway,* 199 F.3d at 1101 (noting that the Multiple Surface Use Act deals with the "problem of sham mining claims" use, among other things, to obtain free residential land); *United States v. Nogueira,* 403 F.2d at 823 (stating that the purpose of the Multiple Surface use was to halt mining

claim including the "acquisition of mining claims for 'residence or summer camp purposes'").

The authority of the Forest Service to regulate the surface use of National Forest lands cannot reasonably be doubted. "While the regulation of mining per se is not within Forest Service jurisdiction, where mining activity disturbs national forest lands, Forest Service regulation is proper." *United States v. Goldfield Deep Mines Co. of Nevada,* 644 F.2d 1307, 1309 (9th Cir.1981).

Consistent with this authority, the Secretary of Agriculture has promulgated regulations concerning the use of surface resources on National Forest lands in connection with mining operations. *See* 36 C.F.R. Part 228. They provide, among other things:

> [A] notice of intention to operate is required from any person proposing to conduct operations which might cause disturbance of surface resources. Such notice of intention shall be submitted to the District Ranger having jurisdiction over the area in which the operations will be conducted. If the District Ranger determines that such operations will likely cause significant disturbance of surface resources, the operator shall submit a proposed plan of operations to the District Ranger.
>
>    *    *    *    *    *    *
>
> (i) A notice of intent need not be filed: Where a plan of operations is submitted for approval in lieu thereof,
>
>    *    *    *    *    *    *
>
> (iii) For operations which will not involve the use of mechanized earth moving equipment such as bulldozers or backhoes and will not involve the cutting of trees.... If a notice of intent is filed, the District Ranger will, within 15 days

of receipt thereof, notify the operator whether a plan of operations is required 36 C.F.R. § 228.4(a).

Mining activities likely to cause significant disturbance of surface resources cannot be carried on in the absence of an approved operating plan. *United States v. Brunskill,* 792 F.2d at 940. Use of a mechanized backhoe in mining operations and maintenance of a fixed residence create sufficiently significant surface disturbances to require an approved operating plan. *United States v. Langley,* 587 F.Supp. at 1266; 5 *American Law of Mining, supra,* § 173.05[4][b] at p.173–32 n. 87.

## II.

Section 261.9(a), 36 C.F.R., prohibits any person from "[d]amaging any natural feature or other property of the United States." Mr. Good is charged with four counts of violating § 261.9(a) by digging trenches with a mechanized backhoe without authorization or approval of the National Forest Service. Second Amended Information, Counts I, II, III, and V.

Section 261.10(a), 36 C.F.R., prohibits any person from "[c]onstructing, placing, or maintaining any kind of ... structure ... on National Forest system land or facilities without a special-use authorization, contract, or approved operating plan." Mr. Good is charged with a single count of violating § 261.10(a) by constructing, placing, or maintaining an A-frame dwelling on National Forest Service land without special-use authorization, a contract, or an approved operating plan. Second Amended Information, Count VI.

Section 261.3(a), 36 C.F.R., prohibits any person from "threatening, resisting, intimidating, or interfering with any forest officer engaged in or on account of the performance of his official duties in the protection, improvement, or administration

of the national Forest System." Mr. Good is charged with a single count of violating § 261.3(a) by threatening, resisting, intimidating, and interfering with Megen Kabele, a Forest Service Officer, as she was performing her official duties on November 21, 2000. Second Amended Information, Count IV.

The case was tried to the court on April 8–10, 2003. Based on the evidence introduced at trial, I find the following facts beyond a reasonable doubt:

1. Quentin H. Good, the defendant herein, established his claim, known as the Dreamtime Mine, in approximately December 1998. In January 1999, he moved a small trailer onto the claim.

2. The Dreamtime Mine is located on National Forest land, in the Pike National Forest, South Park Ranger District, State of Colorado.

3. In January 1999, Mr. Good was contacted by Charles Dunfee of the United States Forest Service. Mr. Dunfee told Mr. Good that it is illegal to mine on National Forest land without a valid operating plan and directed Mr. Good to see Barbara Heidel, a forester for the Pike National Forest.

4. On January 16, 1999, after meeting with Ms. Heidel at the Forest Service office in Fairplay, Colorado, Mr. Good submitted a proposed Plan of Operations for Mining Activities on National Forest Service Lands. Exhibit 5a is a copy of the proposed Operating Plan submitted by Mr. Good, with certain information subsequently added by the Forest Service personnel. The Forest Service added at least the information contained in Part VI.A. of the proposed Operating plan and Mr. Cosby's signature on page 8 of the proposed Operating Plan after it was submitted by Mr. Good. In addition, the proposed Operating Plan as submitted was not signed by Mr. Good.

5. Also present at the meeting between Mr. Good and Ms. Heidel was Megen Kabele. Ms. Kabele is a lands and minerals forester with the United States Forest Service and has had substantial responsibility for monitoring Mr. Good and his operations at the Dreamtime Mine.

6. The proposed Operating Plan submitted by Mr. Good states on pages 3 and 4 that he would proceed by "Pick and Shovel." It also states on pages 3 and 5 that "No live trees will be felled."

7. For reasons which are not entirely clear, but include the press of other business and a shortage of personnel, the Forest Service did not mark Mr. Good's proposed Operating Plan as received until May 6, 1999. At that time, Tim Garcia, a forester in the South Park Ranger District, found the proposed Operating Plan, marked it as received, and processed it.

8. In the course of processing the proposed Operating Plan, Mr. Garcia inserted the following language in Part VI.A.:

No permanent structures will be located on or adjacent to the claim. Any campers or trailers will be removed from the area when not actively exploring, locating or identifying any part of the claim. Burning trash will be subject to any applicable fire restrictions. Claimant is responsible for fire suppression costs & losses associated with any escaped fire. Human waste proper disposal will be the responsibility of the claimant. Claimant must follow Leave No Trace guidelines for the disposal of human waste.

9. Donald Cosby was the District Ranger for the South Park Ranger District in May 1999. Mr. Cosby signed the Operating Plan as approved on May 13, 1999. Exhibit 5a is a copy of Mr. Good's approved Operating Plan, with the exception that Mr. Good had not signed the Operating Plan on May 13, 1999, when it was approved.

10. The approved Operating Plan was mailed to Mr. Good on May 13, 1999, with a cover letter, also signed by the District Ranger, which states in relevant part:

Thank you for your Plan of Operation dated January 16, 1999. Because your operations do not involve any significant manipulation of surface resources, a Plan of Operations will not be required but we will use your submitted plan of operation in lieu of a Notice of Intent. Please let us know, however, if you decide to do any work (i.e. mechanized equipment) that may cause possible 'significant disturbance' to the land, as then a Plan of Operations may be required. Please sign and return the Plan of Operation you filled out.

Exhibit 6 is a copy of Mr. Cosby's letter to Mr. Good conveying the approved Operating Plan.

11. At an undetermined time after May 13, 1999, but on or before June 2, 1999, Mr. Good received the approved Operating Plan in the mail and signed it. Mr. Good did not return the Operating Plan to the District Ranger after signing it.

12. At an undetermined time after May 13, 1999, but on or before June 4, 1999, Mr. Garcia was contacted by Charles Dunfee, who expressed concern about the language in Part VI.A. of the approved Operating Plan. Mr. Dunfee was concerned about the presence of Mr. Good's trailer on the Dreamtime Mine site. According to Mr. Garcia, the Forest Service was concerned about trailers on National Forest Service land so close to Colorado Springs, Colorado. The Forest Service did not want that area of the National Forest to turn into a trailer park.

13. After his discussion with Mr. Dunfee, and on or before June 4, 1999, Mr. Garcia revised his insertion in Part VI.A. of the approved Operating Plan by the addition of the following sentence: "Trailer is not authorized and is subject to all forest occupancy & use restrictions and orders." In addition, Mr. Garcia added the following phrase to Part VI.B. of the approved Operating Plan dealing with the posting of a reclamation bond by Mr. Good: "Will be determined." Exhibit 5b is a copy of the Operating Plan as revised by Mr. Garcia.

14. The revised Operating Plan was signed by Donald Cosby on June 4, 1999.

15. On June 5, 1999, Mr. Garcia with the assistance of Megen Kabele, Charles Dunfee, and Ken Archuleta, went personally to the Dreamtime Mine to deliver to Mr. Good a copy of the revised Operating Plan. At that time, Mr. Good showed Mr. Garcia the approved Operating Plan in the form of Exhibit 5a, which Mr. Good had signed. Mr. Good refused to sign or otherwise agree to the revised Operating Plan because of the sentence added to Part VI.A. concerning whether his trailer was approved.

16. At the time of the meeting on June 5, 1999, Mr. Good had had several confrontations with Mr. Dunfee concerning the presence of his trailer at the Dreamtime Mine site.

17. On July 27, 1999, Mr. Good went to the Forest Service office in Fairplay, Colorado, to deliver a proposed amended Plan of Operations for Mining Activities on National Forest Service Lands. Exhibit F is a copy of the proposed amended Operating Plan, except that the words "Not Authorized" were added by Megen Kabele at some unknown time and the words "See attachment, 'Required changes to plan of operations,'" were added after Mr. Good submitted the proposed amended Operating Plan.

18. Mr. Good's purpose in submitting the proposed amended Operating Plan was to obtain approval for the use of machinery at the Dreamtime Mine and to cut trees on

the claim. To this end, in Part IV.C. of the proposed amended Operating Plan, Mr. Good sought approval to operate "a farm tractor or small backhoe/loader" at the mine; and in Part IV.B., Mr. Good stated his intention to cut "[n]o more than 5 live trees."

19. The proposed amended Operating Plan has not been approved by the Forest Service. Instead, on July 27, 1999, the Forest Service responded to the proposed amended Operating Plan identifying numerous "required changes." Exhibit I is a copy of the response by the Forest Service.

20. In its response, among other things, the Forest Service indicated that it would limit the operating season to the period from April 1 to November 15; would allow machine operations on only two days per week during the periods April 1–30 and September 1–15; would allow hand operations only from May 1 to August 31; and would allow unrestricted machine operations from September 16 through November 15. In addition, the response states:

> Structures, including but not limited to trailer, shed, camper, etc., are not justified on this claim due to easy access and proximity to Lake George and other surrounding communities. The trailer and tool storage structures will not be authorized. Tools must be hauled out and stored off-site when claimant is not present on the claim.

21. On July 29, 1999, apparently in connection with the review by the Forest Service of Mr. Good's proposed amended Operating Plan, Ken Marler, a forester with the United States Forest Service, wrote a memorandum to Megen Kabele stating in relevant part:

> One suggestion is to approve the trailer as he has proposed (trailer to be removed at any time when the claim is not being actively worked), subject to a sea-

sonal time period. A condition of the approval is that it is for a trial basis only for the remainder of this season; that he will keep a daily log of his activities showing dates worked, work accomplished, claim productions, etc.; and that he will submit this to USFS for review at end of season. We could randomly inspect his activities and compare to his log at the end of the season. If he cannot demonstrate that he is actively mining, then he doesn't need the trailer on site.

> The final decision on approval of the on site trailer is with the District Ranger. I can understand why you don't want to approve fulltime occupancy, but on the other hand we need to keep in mind that the holder of a mining claim has more rights than the general public. We want to do what is reasonably necessary to protect the resources and not get "hung up" on whether a guy is trying to beat the system or not. One strategy could be to approve the trailer for season long use, but require the guy to bring in a porta-john for sanitation, provide you with receipts for trash disposal, keep the daily log previously mentioned, etc. He may decide that it is easier to move the trailer every 14 days. My point is to give the guy (within reason) what he has asked for so he won't be writing his Congressman, calling U.S. Attorney, and so forth, but put enough conditions on the approval that he might decide to do something else.

A copy of the memorandum is Exhibit JJ.

22. Frustrated because the Forest Service would not approve an Operating Plan satisfactory to him, Mr. Good submitted to the State of Colorado Division of Minerals and Geology, on February 12, 2000, a Notice of Intent to Conduct Prospecting Operations. Exhibit L is a copy of the Notice of Intent submitted to Colorado.

23. The Notice of Intent submitted to Colorado states at Part 7, dealing with the "Type of Operation":

The work will be done with a small tractor or backhoe. It will consist of pits and/or trenches, not to exceed 3 such pits or trenches at any given time.... There will be a camper-trailer on site to be used for shelter and mineral storage.

24. The State of Colorado approved Mr. Good's Notice of Intent by letter dated February 29, 2000, subject to Mr. Good posting a reclamation bond in the amount of $2,000.00. A copy of the letter approving the Notice of Intent is Exhibit Q.

25. Mr. Good posted the reclamation bond on March 9, 2000, which is evidenced by Exhibit R. On that date, Mr. Good was told by Susan Erickson, a bond administrator for the Colorado Division of Minerals and Geology, that he "could start working."

26. On April 13, 2000, Mr. Good sent a letter to the United States Forest Service stating: "I am rescinding my application for authorization of a plan of operations submitted to your department on 7–27–1999." The letter was received by the Forest Service on April 17, 2000. Exhibit S is a copy of the letter marked as received by the Forest Service.

27. On November 27, 2000, Mr. Good sent a letter to the District Ranger for the South Park Ranger District. Exhibit 7 is a copy of the letter. In the letter, Mr. Good states, among other things: "I revoke and rescind my signature on the plan of operations submitted by me on January 16, 1999."

28. Personnel of the United States Forest Service were at the Dreamtime Mine on numerous occasions, including the following:

(a) November 21, 2000, to deliver a notice of noncompliance and to inspect and record operations on the claim;

(b) March 16, 2001, to inspect and record operations on the claim;

(c) April 25, 2001, in response to a report that Mr. Good was conducting mechanized operations on the claim, to record those operations;

(d) September 25, 2001, to inspect and record operations on the claim; and

(e) October 8, 2002, to determine what additional activity had occurred on the claim.

29. On an unidentified date in 2001, Mr. Good caused to be brought to the Dreamtime Mine site a bulldozer with metal tracks. Photographs of the bulldozer are contained in Exhibit 40. One of the photographs shows the bulldozer removing overburden and is captioned by Mr. Good: "Trench # 1, the first machine dig." The bulldozer caused significant disturbance of surface resources and damaged a natural feature of the United States.

30. On September 25, 2001, Mr. Good hired George Quist to operate a four wheel drive backhoe on the Dreamtime Mine site to dig holes and trenches mechanically. Mr. Good supervised the work. Mr. Quist worked with his backhoe at the Dreamtime Mine for two to three hours on September 25, 2001. The digging by Mr. Quist is captured on a videotape, which was admitted into evidence as Exhibit 3. The backhoe caused significant disturbance of surface resources and damaged a natural feature of the United States.

31. Mr. Good rented a backhoe from Bill's Tool Rental Inc. in Colorado Springs, Colorado, on July 21, 2001; October 23, 2001; and May 1, 2002. In each instance, Mr. Good used the rented backhoe to remove overburden and to do reclamation work at the Dreamtime Mine site. In each instance, the backhoe caused significant disturbance of surface resources and damaged a natural feature of the United States.

32. On unknown dates between September 25, 2001, and October 8, 2002, Mr. Good constructed an A-frame structure on the Dreamtime claim. Since the completion of the A-frame structure, Mr. Good has maintained and used it as his principal residence. The A-frame is accurately depicted in the photographs admitted into evidence as Exhibits 30, 31, and 32.

33. Mr. Good has never had a special-use authorization, contract, or approved operating plan for the construction of a structure at the Dreamtime Mine site.

34. In the course of defending the charges brought by the United States, in the summer of 2002, Mr. Good's lawyer made a request for documents pursuant to the Freedom of Information Act. Megen Kabele compiled documents in response to the FOIA request and forwarded them to the FOIA compliance officer in Pueblo, Colorado. When she compiled the documents to be forwarded to the FOIA compliance officer, Ms. Kabele altered at least one of the documents. Specifically, Ms. Kabele altered the copy of the Plan of Operations submitted by Quentin H. Good and contained in the Forest Service files by obliterating the final sentence of Part VI.A. of the document. Exhibit D is a copy of the document as altered by Ms. Kabele. In addition, Ms. Kabele added the words "Authorized Plan" to the upper right corner of the first page of Exhibit D. In addition, Ms. Kabele added the words "Not Authorized" to the top of Exhibit F. Ms. Kabele testified that she cannot recall when or why she made the additions to Exhibits D and F, and specifically that she cannot recall if those additions were made at the time she compiled documents to be submitted to the FOIA compliance officer.

## III.

■ **Count I:** The sole evidence supporting the charge that Mr. Good dug a trench at the Dreamtime Mine with a mechanized backhoe on or about March 16, 2001, is the testimony of Megen Kabele. I find Ms. Kabele's testimony to be incredible, however, and I therefore conclude that the government has not proven the offense charged in Count I beyond a reasonable doubt.

In view of her leading role in the prosecution of the charges against Mr. Good, I do not understand why Ms. Kabele would be assigned to or assume the task of gathering documents in connection with Mr. Good's FOIA request. In any event, her actions in altering at least one of the documents submitted to the FOIA compliance officer evidences her willingness to act improperly, deceive, and alter evidence in connection with this prosecution. I find Ms. Kabele's testimony untrustworthy in view of her actions obliterating crucial portions of the Operating Plan contained in the files of the Forest Service.

■ **Counts II, III, and V:** There is substantial and credible evidence establishing beyond a reasonable doubt that Mr. Good damaged natural features and property of the United States by the use of a mechanized backhoe at the Dreamtime Mine without authorization or approval. Specifically, the damage by Mr. Quist's backhoe on April 25, 2001, is admitted by Mr. Good; is established by the testimony of Mr. Quist; and is shown in the videotape of the incident. The damage on or before September 25, 2001, is established by Mr. Good's rental of a backhoe on July 21, 2001, and by his admission that he operated the backhoe at the Dreamtime Mine to remove overburden and to reclaim other trenches and holes. The damage on or before October 8, 2002, is established by Mr. Good's rental of a backhoe on October 23, 2001, and May 1, 2002, and by his admission that he operated the backhoe at the Dreamtime Mine to remove overburden and do reclamation work. Throughout

the period from April 25, 2001, to October 8, 2002, Mr. Good did not have an approved Operating Plan, having rescinded the approved plan of January 16, 1999, by his letter dated November 27, 2000.

■ **Claim IV:** The sole evidence supporting the charge that Mr. Good threatened, resisted, intimidated, and interfered with Megen Kabele as she performed her official duties on November 21, 2000, is the testimony of Ms. Kabele. Because I have found Ms. Kabele's testimony to be untrustworthy, I conclude that there is no credible evidence to support the charge, and the government has not proven guilt beyond a reasonable doubt.

The government argues that Ms. Kabele's account of the events of November 21, 2000, is substantiated by Ronald Zaccaginni, a Colorado Department of Wildlife law enforcement officer, who accompanied Ms. Kabele on that date. Mr. Zaccaginni's testimony, however, is merely that Mr. Good was vocal, very loud, antagonistic, and argumentative; that he paced back and forth and demanded that Ms. Kabele leave the claim; and that the situation was very tense. Significantly, Mr. Zaccaginni, a trained law enforcement officer, did not testify that Mr. Good threatened, resisted, intimidated, or interfered with Ms. Kabele.

■ **Count VI:** It is admitted by Mr. Good that after September 25, 2001, he constructed an A-frame structure at the Dreamtime Mine. The A-frame structure still is there and is maintained by Mr. Good as his principal residence. Mr. Good has never had any authorization to construct the A-frame structure.

### IV.

Whether it was a Notice of Intent, as the government contends, or an approved Operating Plan, as Mr. Good has argued, I have found beyond a reasonable doubt that on November 27, 2000, Mr. Good revoked and rescinded his approved Operating Plan with the United States Forest Service. Similarly, although it had not been approved, Mr. Good on April 13, 2000, rescinded his application for an amended Operating Plan which sought approval for mechanized operations at the Dreamtime Mine. Consequently, on and after November 27, 2000, Mr. Good had neither a valid Notice of Intent nor an approved Operating Plan from the Forest Service for mining operations at the Dreamtime Mine.

Mr. Good never was authorized, by any operating plan, notice of intent, special use permit, or contract to construct a structure at the Dreamtime Mine. The approved Operating Plan dated January 16, 1999, expressly provides that "[n]o permanent structures will be located on or adjacent to the claim," and allows Mr. Good to keep his trailer at the claim only while he is actively exploring, locating, and identifying. The Colorado Notice of Intent approved a "camper-trailer on site," but did not approve construction of a permanent structure.

Mr. Good raises as a defense to the charges his good faith belief, based on the Notice of Intent approved by the State of Colorado, that he was authorized to engage in mechanized mining. Thus, Mr. Good argues, he lacked the requisite intent to violate the regulations. The government relies on *United States v. Unser,* 165 F.3d 755 (10th Cir.1999), for its assertion that the offenses charged are strict liability offenses requiring no showing of intent.

In *Unser,* the circuit court affirmed the determination of the trial court that violations of a Forest Service regulation prohibiting the operation of a snowmobile in a Wilderness Area was a strict liability offense and does not require proof of any intent, or mens rea, on the part of the defendant. The circuit court characterized the violation of the Forest Service regula-

tion as a "public welfare offense," and stated:

> Many of these offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize. While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as offenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect, whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibility.

*Unser,* 165 F.3d at 762 (quoting *Morissette v. United States,* 342 U.S. 246, 255–56, 72 S.Ct. 240, 96 L.Ed. 288 (1952)).

The court adopted a sliding scale to determine whether a violation is a public welfare offense, imposing strict liability where: (1) the statute omits mention of intent and involves what is basically a matter of policy; (2) the standard imposed is reasonable and adherence to it properly expected of a person; (3) the penalty is relatively small and the conviction does not gravely besmirch the violators reputation; (4) the crime is one not taken from the common law; and (5) congressional purpose is supporting. *Id.* at 762 (quoting

*Holdridge v. United States,* 282 F.2d 302, 310 (8th Cir.1960)).

■■ In this case, as in *Unser,* I find that violation of the Forest Service regulations are public welfare offenses. The regulations charged lack any mention of an intent element and their enforcement is basically a matter of policy to protect the National Forests from depredation; it is reasonable to expect a person engaged in the highly regulated enterprise of mining to comply with regulations for protection of the forest lands; the penalty of not more than 6 months imprisonment and not more than a $500 fine is relatively small; convictions for violating regulations against mechanical mining and constructing an unapproved structure do not gravely besmirch Mr. Good's reputation; the offenses do not derive from the common law; and there is congressional intent supporting imposition of penalties for violations of the regulations designed to protect the National Forest lands. Consequently, I find that violations of 36 C.F.R. §§ 261.9(a) and 261.10(a) are public welfare offenses, are strict liability offenses, and the government need not establish any element of intent on the part of the defendant to convict.

Mr. Good also argues that the Forest Service tacitly approved his actions by allowing them to occur over a period of nearly three years—from December 1998 when he first moved his trailer onto the Dreamtime Mine site until November 2001 when the Forest Service citations were issued. The asserted defense lacks any factual support. Officer Dunfee promptly notified Mr. Good in December 1998 that his operations violated Forest Service regulations and directed him to contact the District Ranger's office to seek the necessary approval. From May 1999 and thereafter Forest Service personnel responded to Mr. Good's various proposed ·Operating

Plans, inspected his operations, and advised him of identified violations. It cannot be said that Mr. Good was lulled into the belief that his operations were in compliance with Forest Service regulations. He regularly was advised that his operations violated the regulations, but he proceeded in defiance of Forest Service authority.

Nor is there any support in the law for the asserted defense. As the court stated in *Teller v. United States* in connection with the defendant's unlawful removal of trees from an unpatented mining claim:

> A general custom to violate the law cannot, on any principles of morality or law, justify it. Neither can it justify an individual instance of violation of the law. Neither can knowledge of such violation by an agent of the United States excuse or justify it. If it were otherwise,... any ... agent of the government ... could annul any act of congress at pleasure.

113 F. at 276.

■ Mr. Good also argues that it was improper for the government to charge him with a crime; rather, the Forest Service should have proceeded against him administratively through notices of noncompliance and proceedings to cancel his claim. This argument also lacks merit. The law is clear that the Forest Service may proceed by criminal prosecution for violations of the regulations governing mining and protection of the National Forest lands. 36 C.F.R. § 261.1b ("Any violation of the prohibitions of this Part (261) shall be punished by a fine of not more than $500 or imprisonment for not more than six months, or both"); *United States v. Langley,* 587 F.Supp. at 1265 and n. 11 (noting that Forest Service regulations may be enforced in federal district court by injunction or criminal prosecution). Moreover, the cases are overwhelming that the government is not required to

pursue administrative proceedings before bringing enforcement actions in federal court. For example, in *United States v. Goldfield Deep Mines*, the court rejected a similar argument stating:

> Goldfield claims that the Government should have exhausted its administrative remedy before the Department of Interior. This is an alternative remedy which the Government successfully pursued. However, the right to protect Forest Service lands from waste is separate from and in addition to the right to challenge mining claims. The jurisdiction of the Department of Interior is not to the exclusion of the district court's. There was no need to exhaust the mining claim proceedings before enjoining destruction of forest lands.

644 F.2d at 1309 (internal citations omitted). *Accord United States v. Bagwell,* 961 F.2d at 1453–54; *United States v. Nogueira,* 403 F.2d at 822–23; *United States v. Langley,* 587 F.Supp. at 1261–62.

Finally, Mr. Good argues that his conduct should be excused because the Forest Service acted with an ulterior motive when dealing with him—the Forest Service, he claims, was not really concerned with his mining operations but, instead, believed that he was not proceeding in good faith with respect to his mining claim and was merely using the claim to obtain a cabin site without charge. *See United States v. Shumway,* 199 F.3d at 1096, 1107. Here, however, Mr. Good revoked his approved Operating Plan; withdrew his proposed amended Operating Plan; refused to deal with the Forest Service in any meaningful operating plan consideration process; and constructed a cabin without ever seeking any approval to do so. Under these facts, the actions of the Forest Service in its dealings with Mr. Good were reasonable and did not impermissibly encroach on Mr. Good's legitimate use of his mining claim.

## V.

It would be generous for me to describe the relationship between Mr. Good and the Forest Service as an "ongoing feud." *See United States v. Goldfield Deep Mines,* 644 F.2d at 1308. What is apparent is that Mr. Good was uncooperative to the point of being belligerent in his dealings with the Forest Service. When the Forest Service would not agree with his proposals, Mr. Good acted in defiance of the federal authority and proceeded nonetheless as he wanted.

Normally, violations of surface regulations like those asserted here are pursued civilly through trespass, waste, and ejectment actions. I wonder if the government would not have been better served in proceeding so here. However, the evidence establishes violations of the regulations beyond a reasonable doubt. Mr. Good acted in open defiance of Forest Service authority, and his violations are open, notorious, and substantial. There can be no doubt of the government's right to proceed by criminal prosecution for these violations.

## VI.

I find the defendant GUILTY of the charges contained in Counts II, III, V, and VI of the Second Amended Information, evidence beyond a reasonable doubt existing.

I find the defendant NOT GUILTY of the charges contained in Counts I and IV of the Second Amended Information, the government having failed to produce evidence beyond a reasonable doubt.

## VII.

IT IS ORDERED that a sentencing hearing in this matter is set for **May 16, 2003, at 3:00 p.m.,** in Courtroom 2, Alfred A. Arraj United States Courthouse, 1901 19th Street, Denver, Colorado, at which time Mr. Good, his counsel, and the United States shall appear personally.

IT IS FURTHER ORDERED that the summons issued to Mr. Good shall continue pending sentencing.

IT IS FURTHER ORDERED that a final judgment will not enter until the date of sentencing, with the time for appeal commencing to run on that date.